| | | |
|---|---|---|
| MEDLINE INDUSTRIES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | TRIAL BY JURY DEMANDED |
| DIVERSEY, INC. | ) | FOR ALL COUNTS SO TRIABLE |
| PETER MELCHIOR | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Medline Industries, Inc., by and through its attorneys, Ralph A. Weber and Stephen T. Trigg of Gass Weber Mullins LLC, states as follows as its Complaint for Injunctive and Other Relief against Defendants Diversey, Inc. and Peter Melchior:

### NATURE OF THE ACTION

1.      No one can dispute, and the Court can take judicial notice, that our nation is currently fighting a national pandemic of a type not seen for over a century. Among the most vital frontline workers in this battle are people working in hospitals and nursing homes. These workers desperately need proper cleaning supplies in order to protect patients, residents and themselves.

2.      The parties to this action are key players in the supply of these essential cleaning products. As described below, in recent months defendants executed a plan to redirect away from Medline and toward Diversey critical cleaning products that Diversey's competitor, Medline, has the right to purchase under a longstanding requirements contract. Indeed, Medline's contractual rights were affirmed in writing just weeks before the wrongful plan described herein took effect.

3.    Medline presently is seeking to enforce its contract rights against its contractual partner, Wypetech, LLC.  It brings this action in this Court to pursue its tort claims and remedies against these defendants who improperly interfered with the Medline-Wypetech contract.

4.    Medline requests the unusual remedy of injunctive relief because in these extraordinary times the delays that are routine in litigation will cause irreparable harm to Medline and its hospital and nursing home clients (and their patients and residents). The Court's rarely-used equitable powers should be brought to bear to prevent defendants from reaping the benefits of their tortious interference that is causing immediate, irreparable damage to Medline.

5.    Medline manufactures and distributes a broad array of product offerings to its customers in the healthcare industry, which include hospitals and nursing homes.  Among Medline's products are Micro-Kill™ Bleach Wipes and Micro-Kill+™ Wipes, which are lines of disinfectant wipes products manufactured with unique solution formulas.  Micro-Kill™ Bleach Wipes and Micro-Kill+™ Wipes each have specific kill-claims (an industry term meaning the proven effectiveness of a given disinfectant product) which Medline's customers depend upon to fulfill the crucial disinfection function that keeps patients safe.

6.    Non-party Wypetech, LLC is a manufacturer of disinfectant wipes, and until June 2020, Wypetech supplied all of Medline's lines of Micro-Kill™ Bleach Wipes and Micro-Kill+™ Wipes pursuant to a Requirements Contract that prevents Medline from using alternate suppliers for the products supplied by Wypetech (the "Products").  On or about July 1, 2020, Diversey, a company that makes products that compete with Medline products sold to hospitals and nursing homes, including disinfectant wipes, acquired the membership interests of Wypetech.

7.    Peter Melchior was formerly an owner of Wypetech and its President.  Melchior has stayed on as Wypetech's President following the sale of his membership interests to Wypetech.

8.      Both before and after Diversey acquired the membership interests of Wypetech it interfered with the relationship between Wypetech and Medline.  As a result of Diversey's interference, Wypetech discontinued delivery of Medline disinfectant wipes and diverted Wypetech's manufacturing capacity away from Medline.  Diversey has instructed Wypetech to dishonor all of Medline's future purchase orders and has sharply limited filling the back orders to a mere 10,000 cases or less per month.  Indeed, in September, Medline received **no product** from Wypetech.  Therefore, rather than obtaining the bulk of Wypetech's manufacturing capacity, Medline will, at best, receive a small share, or none at all, while Diversey controls the rest.

9.      In the run up to the sale of his interests, and continuing after the sale closed, Melchior and Diversey conspired to injure Medline's interests and interfere with Wypetech's Requirements Contract with Medline.  The defendants acted together and with malice with the common purpose of injuring Medline's business.  The defendants' actions financially injured Medline.

10.     Medline at all times has honored the Requirements Contract, including the Contract's exclusivity arrangement which, until Wypetech's repudiation thereof, prohibited Medline from obtaining an alternate supplier.  Medline requests a preliminary injunction to stop Diversey's interference with Wypetech's performance to ensure that Medline can continue to supply its customers with critically necessary products during the ongoing public health crisis.

## JURISDICTION AND VENUE

11.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  From Medline's point of view, its inability to obtain the goods due it under the Requirements Contract due to Diversey's interference has a value of more than $75,000. There is complete diversity

between Medline, Diversey, and Melchior, which are citizens of different states as set forth more fully below.

12.     This Court has personal jurisdiction over Diversey because Diversey intentionally engaged in suit-specific conduct and created contacts with Wisconsin in furtherance of its tortious conduct, such that Diversey has a substantial connection with Wisconsin arising out of its contacts with Wisconsin.  Diversey's conduct and communications directed at Wisconsin constitute the tortious interference that is the subject of this Complaint.  Diversey's tortious interference included the acquisition of the membership interests in Wypetech, LLC, a Wisconsin LLC.  Diversey previously admitted that the vast majority of the activity related to this acquisition occurred in Wisconsin.  The court further has personal jurisdiction over Diversey to the extent the claims involve Diversey's conduct as the sole member, officer, director or manager of Wypetech following its purchase of Wypetech's membership interests.

13.     This Court has personal jurisdiction over Melchior because he is a natural person and a citizen of Wisconsin.

14.     The actions of Diversey and Melchior support personal jurisdiction over them here in Wisconsin under both Wis. Stat. § 801.05 and the Fourteenth Amendment.

15.     Venue is appropriate in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred within this judicial district.

## PARTIES

16.     Medline is an Illinois corporation, with a principal place of business at Three Lakes Dr., Northfield, IL.  Medline is a manufacturer and distributor of medical supplies, providing products, education and support across the continuum of care.

4

17.     Diversey is a Delaware corporation, with a principal place of business at 1300 Altura Road, Fort Mill, SC. Diversey is a manufacturer of numerous products, including disinfectant wipe products, which Diversey distributes nationally, including in Wisconsin.

18.     Melchior is a natural person who is a citizen of Wisconsin.

19.     Non-party Wypetech is a limited liability company, organized in Wisconsin, with a principal place of business at 8372 N. Steven Rd., Milwaukee, WI. Wypetech is a manufacturer of wet wipe products. On information and belief, based on representations made by representatives of Wypetech and Diversey, Diversey is Wypetech's sole member.

## FACTUAL ALLEGATIONS

20.     As and for its Paragraph 20, Medline adopts and incorporates Paragraphs 1 through 19 as if fully restated herein.

### *The Nature of Medline's Business*

21.     Medline seeks to provide a comprehensive array of product offerings (including both Medline-branded products and distribution of other manufacturer's products) to meet the needs of its customers in the healthcare industry, which include hospitals and nursing homes. Medline's business depends upon its ability to offer the broadest possible selection of products in multiple segments so that Medline can, by growing volume as much as possible, keep its overall prices as low as possible.

22.     The environmental services function ("EVS") is a critical aspect of the operations at hospitals and nursing homes, which must provide a clean, disinfected environment of care to fulfill their mission. Medline's product line includes products used by clinicians providing patient care and also in the EVS functions of hospitals and nursing homes. One line of products that Medline offers is its branded disinfectant wipes, which include the Micro-Kill™ Bleach Wipes

and Micro-Kill+™ Wipes. Medline's ability to provide its branded disinfectant wipes to its customers as a part of its product line is an integral part of Medline's overall business strategy – not to mention an integral part of hospitals and nursing homes' cleaning protocols to maintain a clean and disinfected environment.

23. Medline's branded products compete with products manufactured by Diversey. Like Medline, Diversey offers EVS products to hospitals and nursing homes. Like Medline, Diversey has a line of branded disinfectant wipes it offers to hospitals and nursing homes. Medline and Diversey's branded disinfectant wipe products have key differences, but also several similarities. For example, both Medline's and Diversey's wipes use the same fabric substrate, known as ERHT manufactured by the firm of Kimberly-Clark, so Medline and Diversey compete for this raw material. In addition, certain wipes sold by Medline and Diversey are packaged in the same canisters so there is also competition for the availability of the canisters.

### The Unique Features of Medline's Micro-Kill™ Bleach Wipes

24. Medline's Micro-Kill™ Bleach Wipes are pre-saturated with a proprietary solution formula owned by Medline called Micro-Kill™ Bleach. Micro-Kill™ Bleach Wipes have broad spectrum disinfectant properties that are important for Medline's customers. The Micro-Kill™ Bleach formula is proprietary to Medline; no other manufacturer uses Medline's Micro-Kill™ Bleach formula without Medline's express permission. All Medline personnel (and manufacturing partners) who have access to the Micro-Kill™ Bleach formula execute confidentiality agreements that proscribe disclosure of Medline's formulas.

25. Among other properties, Micro-Kill™ Bleach Wipes have been proven effective at killing the *Clostridium difficile* ("*C. diff*") spores, which cause a *C. diff* infection ("CDI"). CDI is a gastrointestinal disorder that commonly can be spread in hospitals and nursing homes in the

6

absence of an EVS protocol specifically designed to address its spread. Micro-Kill™ Bleach Wipes also have been proven effective in killing viruses and vegetative bacteria listed on the EPA master label after only 30 seconds of exposure. Most competing products on the market have only been proven effective in exposure times of 60 seconds or more. Medline's Micro-Kill™ Bleach Wipes' are appealing to hospitals and nursing homes because those disinfectant wipes are effective as a sporicide, are able to kill an invasive yeast, and have the proven ability to kill many other pathogens after only 30 second exposure.

26.     The product label for Micro-Kill™ Bleach Wipes summarizes the so-called "kill-claims" (an industry term meaning which pathogens a given disinfectant product has been proven to kill). The process of establishing a "kill-claim" is expensive, requiring testing and validation that consumes money and time. Under the EPA's Pesticide Registration Improvement Act ("PRIA"), before a formula owner, like Medline, may make amendments to its labels, the formula owners must submit notifications to state EPAs, which may vary in review time and costs. Altogether, the costs of adding kill-claims runs into tens of, and sometimes low hundreds of thousands of dollars, and may take as long as 12-18 months before a product can be sold with the new kill-claims.

27.     In reliance on the proven capabilities of Micro-Kill™ Bleach Wipes, Medline's hospital and nursing home customers adopt cleaning protocols that take advantage of those capabilities. For example, using Micro-Kill™ Bleach Wipes gives a hospital confidence that it is addressing *C. diff* spores by use of the technology in Micro-Kill™ Bleach Wipes. Indeed, the establishment of cleaning protocols based on the properties of the Medline disinfectants is a key element of the long-term relationship between Medline and its disinfectant customers. If forced to

change to products that lack the capabilities of Micro-Kill™ Bleach Wipes, Medline's customers may be forced to adopt different cleaning protocols and retrain their staff.

*The Terms of the Requirements Contract*

28.     Medline had a long-standing relationship with Wypetech's predecessor Multi-Pack, LLC, pursuant to which Multi-Pack supplied Medline with Medline-branded disinfectant wipe products.  In 2013, Medline and Multi-Pack began negotiating the terms of a new agreement. Those negotiations resulted in the execution of an agreement effective August 19, 2014 (the "Requirements Contract").  *See* Exhibit 1.

29.     Contracts like the Requirements Contract are standard in the medical products industry as manufacturers like Medline depend upon reliable and predictable supplies, so Medline's customers can have confidence that Medline's products will always be available, especially those products that support the critical needs of hospitals and nursing homes (such as disinfection functions).

30.     By email and letter dated April 2019, Wypetech informed Medline that Wypetech became the assignee of Multi-Pack, LLC under the Requirements Contract. (Exhibit 2.) That assignment was not controversial to Medline, because Wypetech took over Multi-Pack's Wisconsin plant that had already been the facility meeting Medline's requirements.  Melchior later confirmed, in an email dated June 2, 2020 that Wypetech had assumed the Requirements Contract as part of the Multi-Pack transaction.  (Exhibit 6.)

31.     Melchior was a member and President of Wypetech from the time it became the assignee of the Requirements Contract until Diversey purchased his membership interests.  Upon information and belief, Melchior remains the President of Wypetech following its purchase by Diversey.

32.	At the time that Wypetech accepted assignment of the Requirements Contract, Wypetech was manufacturing certain Medline-branded disinfectant wipe products for Medline including:

| SKU | DESCRIPTION |
|---|---|
| COMPMATE1 | Private Label Food Surface Wipe |
| EVS70111 | Disposable Dry Wipes (replaced by EVS70111B/R) |
| EVS70111B | Disposable Dry Wipes Bucket & Lid replacement |
| EVS70111R | Disposable Dry Wipes Refill, 6 rolls/cs |
| MOIQC2003 | SaniQ, 6x6, 12/160ct |
| MSC351200 | Micro-Kill+, 6x6.75, 12/160ct, canister |
| MSC351210 | Micro-Kill+, 10x10, 12/65ct, canister |
| MSC351230 | Micro-Kill+, 7x10, 12/50ct, canister |
| MSC351240 | Micro-Kill+, 10x14, 12/42ct, canister |
| MSC351400AN | Micro-Kill Bleach, 7x8, 8/150ct, canister |
| MSC351410AN | Micro-Kill Bleach, 5x6, 6/150ct, canister |
| MSC351440AN | Micro-Kill Bleach, 12x12, 8/55ct, canister |
| MSC351450AN | Micro-Kill Bleach, 12x12, starter kit: 4/110ct + bucket |
| MSC351500 | Touchscreen Cleaning Wipes, 6x6, 12/160ct, canister |

Thereafter, Wypetech and Medline agreed to add the following to the list of Products:

| SKU | DESCRIPTION |
|---|---|
| MSC350300 | EPI-CLENZ Hand Sanitizing Wipes, 6X6.7",160CT, 12/cs, 65% alcohol |
| MSC350330 | EPI-CLENZ Hand Sanitizing Wipes, 7x10",50CT, 12/cs, 65% alcohol |
| MSC351450BG4 | Micro-Kill Bleach, 12x12, 4/110ct, bag refill |
| MSC351450BKT8 | Micro-Kill Bleach Labeled Bucket/Lid Combo, 8/cs |
| MSC351500 | Touchscreen Cleaning Wipes, 6x6, 12/160ct, canister |

33.	The identity of the Products and the related price per unit are not in dispute here but have been settled and stable between Medline and its supplier for years. Attached hereto as Exhibit 1(A) is a list of Products which was exchanged between Multi-Pack and Medline in November of 2013. Attached hereto as Exhibit 1(B) is a list of Products provided by Multi-Pack to Medline dated September 21, 2014. Attached hereto as Exhibit 1(C) is a list of Products provided by Wypetech to Medline in September of 2019. Comparing Exhibits 1(A), 1(B) and 1(C)

with the list of Products set forth in Paragraph 32 establishes that Wypetech (and its predecessor Multi-Pack) have supplied Medline with a consistent slate of disinfectant wipe products at consistent pricing throughout the parties' relationship. The list of Products therein was not new; Multi-Pack had been providing Medline with those Products for years. From time to time, as contemplated by Section 3 of the Requirements Contract, the parties discussed and agreed upon additional Products and changes in prices. Subsequent to Wypetech's acquisition of Multi-Pack, Medline and Wypetech had continuing conversations regarding significant expansion of the slate of Products, including discussions regarding moving the production of other brands of Medline disinfectant wipe products to Wypetech and broadening the offerings of current Products to better compete with disinfectant wipe products sold through Medline's Distributed Products Division.

34.     The Requirements Contract sets up the process by which Medline communicates its requirements for the Products to Wypetech. First, Medline provides Wypetech with non-binding rolling ninety-day forecasts (the "Forecasts") for each of the Products. Ex. 1 at § 1(a). Thereafter, Medline is permitted to submit purchase orders to Wypetech. Wypetech "shall manufacture, package and sell, and [Medline] shall purchase, all Products specified in purchase orders submitted from time-to time by [Medline] in accordance with the Forecast, which purchase orders, shall be deemed accepted by [Wypetech] upon receipt thereof…" Ex. 1 at § 1(b).

35.     In the event Medline submits a purchase order in excess of its Forecast, any portion not in excess of the Forecast is deemed accepted by Wypetech; Wypetech, may choose to accept the portion of the purchase order in excess of the Forecast at its discretion. Ex. 1 at § 1(b).

36.     Furthermore, the Requirements Contract provides exclusivity to Wypetech: "[Wypetech] shall be the exclusive contract manufacturer of the Products for [Medline], and [Medline] shall not contract with any other party to manufacture or package the Products…" Ex.

1 at § 6. Indeed, Medline is only permitted to seek a different vendor for the Products if "[Medline's] reasonable requirements…shall exceed [Wypetech's] capacity to produce such products…" Ex. 1 at § 6.

37. Therefore, the Requirements Contract obligates Wypetech to dedicate its manufacturing capacity to supply Medline's reasonable requirements for all products on Medline's purchase orders, provided that those purchase orders do not exceed the Forecasts provided to Wypetech.

38. The initial term of the Requirements Contract was five years (through August 2019), which automatically extends in one-year renewal terms absent express written notice otherwise, or a termination in accordance with its provisions. Ex. 1 at § 9. The contract renewed in August 2019 through August 2020. Because neither party provided notice of non-renewal of the current term, the next renewal term commenced on August 19, 2020 and runs through August 19, 2021.

### *Wypetech's Performance Prior to Diversey's Involvement*

39. Pursuant to the Requirement Contract, Medline dutifully submitted Forecasts, followed by purchase orders for disinfectant wipes to Wypetech (and its predecessor Multi-Pack). From time to time, Wypetech would ask that Medline accelerate the process of submitting purchase orders by foregoing Forecasts, and Medline complied with those requests. Until quite recently, Wypetech (and predecessor Multi-Pack), dutifully filled Medline's purchase orders. The chart below reflects sales over the past three years:

| Year | Quantity of Wipes in Cases | Amount paid by Medline |
|------|----------------------------|------------------------|
| 2017 | 189,989 | $6,687,321 |
| 2018 | 182,497 | $6,454,315 |

| 2019 | 189,933 | $6,374,521 |
| --- | --- | --- |

40.     Because of the COVID-19 crisis, there has been an explosion in the demand for disinfectant products in general, and disinfectant wipes in particular.  As a result, between January and June 2020, Medline ordered over 600,000 cases of disinfectant wipes with a value to Wypetech in excess of $16 million.

41.     The increased demand for disinfectant wipes created manufacturing challenges, including securing sufficient component materials and increasing staffing.  Medline worked closely with Wypetech to keep the production of wipes at the levels Medline needed to conduct its business.  During the first half of calendar 2020, Wypetech was able to fill orders of as many as 16,000 cases in a single week and more than 60,000 cases during the month of April 2020 alone.

42.     Wypetech did not complain that Medline's increased requirements for Products were unreasonable nor suggest that it believed Medline was limited to Product delivery at a level measured by its pre-COVID orders.  Nor did Wypetech express to Medline that it believed that Medline's increased orders for Products was based on anything other than Medline's good faith requirements for the Products.  Instead, during April, at the zenith of Wypetech's performance, Wypetech solicited from Medline additional forecasts and orders, at levels approximating April's output level, for May and June of 2020.

*** Wypetech Stops Performing ***

43.     Thereafter, despite Wypetech's previous enthusiasm to continue at the April 2020 pace, Wypetech's delivery of disinfectant wipes began to run far behind the purchase orders submitted by Medline.  By May 2020, Wypetech's deliveries were down more than 70% from the prior month to only 17,000 cases.

44.     In discussing the lagging production, Wypetech representatives told Medline that the shortfall was due to Wypetech's inability to obtain sufficient component materials. They assured Medline that Wypetech was working to secure the materials that would enable it to fill Medline's purchase orders.

45.     Wypetech never complained that Medline's purchase of disinfectant wipes from other sources was a breach of the Requirements Contract. Likewise, Wypetech never told Medline that Wypetech would stop filling Medline's orders once Wypetech had shipped a number of cases that approximately equaled Medline's total 2019 orders. Nor did Wypetech ask Medline to limit its orders for Products in any way. Indeed, in May and June, Wypetech assured Medline that "you are the priority on our end!" Medline had no reason to doubt the assurances of its trusted supplier.

46.     After June 25, 2020, however, ***Wypetech ceased deliveries of disinfectant wipes to Medline***. Thereafter, Wypetech stopped timely responding to Medline's emails and phone calls.

47.     Medline submitted Forecasts for 2020 as required, but Wypetech has not delivered the Products called for by the purchase orders submitted pursuant to the Forecasts. Medline had numerous unfilled purchase orders that were duly submitted to Wypetech but that Wypetech has not filled, as illustrated in the following chart:

| SKU | Description | PO Qty |
|---|---|---|
| MSC351410AN | Micro-Kill Bleach, 5x6, 6/150ct, canister | 256,380 |
| MSC351400AN | Micro-Kill Bleach, 7x8, 8/150ct, canister | 165,258 |
| MSC351200 | Micro-Kill+, 6x6.75, 12/160ct, canister | 123,385 |
| MSC351230 | Micro-Kill+, 7x10, 12/50ct, canister | 52,848 |
| MSC351210 | Micro-Kill+, 10x10, 12/65ct, canister | 30,120 |
| MSC350330 | EPI-CLENZ Hand Sanitizing Wipes, 7x10",50CT, 12/cs, 65% alcohol | 18,000 |

13

| MSC350300 | EPI-CLENZ Hand Sanitizing Wipes, 6X6.7",160CT, 12/cs, 65% alcohol | 12,000 |
|---|---|---|
| MSC351440AN | Micro-Kill Bleach, 12x12, 8/55ct, canister | 9,478 |
| MSC351450AN | Micro-Kill Bleach, 12x12, starter kit: 4/110ct + bucket | 7,008 |
| MSC351240 | Micro-Kill+, 10x14, 12/42ct, canister | 7,008 |
| MSC351500 | Touchscreen Cleaning Wipes, 6x6, 12/160ct, canister | 6,135 |
| MOIQC2003 | SaniQ, 6x6, 12/160ct | 3,672 |
| MSC351450BG4 | Micro-Kill Bleach, 12x12, 4/110ct, bag refill | 1,395 |
| EVS70111B | Disposable Dry Wipes Bucket & Lid replacement | 188 |
| COMPMATE1 | Private Label Food Surface Wipe | 150 |
| MSC351450BKT8 | Micro-Kill Bleach Labeled Bucket/Lid Combo, 8/cs | 75 |

48.     In August, Wypetech, acting under the influence of Diversey and Melchior, limited its delivery of Products to Medline to 10,000 cases.  On information and belief, based on records of Wypetech's deliveries to all customers in the month of August, Wypetech's delivery to Medline represented approximately ten percent of Wypetech's capacity for that month.

49.     Wypetech, acting under the influence of Diversey and Melchior, indicated that it would cap further shipments of Products to Medline at approximately 10,000 cases per month in September and October, and would not make any assurances of future deliveries.  Even this promise was woefully insufficient to meet Medline's existing purchase orders, much less even approaching Wypetech's capacity.  But in September Medline received no Products at all from Wypetech.  It is apparent that Diversey and Melchior have forced Wypetech to devote its manufacturing capacity to fulfilling other client's orders before fulfilling its contract with Medline, or even the belated agreement to provide approximately 10,000 cases per month to Medline.

50.     Medline is waiting for Wypetech to fulfill its supply obligations under the outstanding purchase orders so that Medline can complete orders from its own customers – both

customer orders that already have been placed with Medline and orders that Medline reasonably anticipates over the next few months. But it is clear that Diversey and Melchior are prohibiting Wypetech from honoring its commitments under Requirements Contract, or even its more recent commitment to provide approximately 10,000 cases per month of Products to Medline.

***Medline Learns of Diversey's and Melchior's Involvement in Wypetech's Failure to Perform***

51.     Medline did not understand what had caused its long-time supplier to move from a communicative partner working collaboratively to meet increased supply requirements, to a recalcitrant communicator that neither responded to e-mails nor supplied properly ordered Products. At some point in early July 2020, a Diversey representative told a Medline employee that Diversey was in the process of purchasing Wypetech from Melchior. The content and tone of that conversation suggested that the Diversey representative was aware that Diversey's purchase of Wypetech would not be welcome news to Medline. It also was apparent that negotiations with Melchior and work on this acquisition were occurring long before the acquisition was completed, with Diversey and Melchior likely influencing Wypetech's production and output for Product purchasers other than Diversey, including especially Medline.

52.     On July 9, 2020, Wypetech informed Medline in an email that Wypetech had in fact been acquired by Diversey, a Medline competitor in the area of disinfectant wipes. (Ex. 3, July 9, 2020 Email from S. Brunow).

53.     The July 9 email further states that based on the "integration of the Wypetech business into Diversey" "new purchase orders would not be accepted." Ex. 3. The email did not address the status of existing purchase orders, including those referenced in Paragraph 47 above. Within an hour of receiving the news that Diversey had purchased Wypetech, Medline was further directed to make all further communication with Diversey, not Wypetech. (Ex. 4, July 9, 2020 Email from P. Melchior).

54.     The July email was the first time Wypetech had instructed Medline to stop sending purchase orders for Products or suggested that Wypetech might not honor its obligations under the Requirements Contract to dedicate its capacity to Medline's reasonable requirements for Products. Concerned that its exclusive supplier of disinfectant wipe products was now controlled by a direct competitor in that field, Medline requested additional information from Diversey regarding the acquisition and sought assurances of performance of Wypetech's obligations under the Requirements Contract.

55.     In response, Diversey explained that its acquisition consisted of a membership purchase by Diversey and that Peter Melchior would be continuing as President of Wypetech and therefore responsible for the day-to-day operations of the business. (Ex. 5, July 20, 2020 Email from T. Dumas, Diversey's Regional General Counsel).

56.     The July 20 email references the Requirements Contract and expresses Diversey's understanding that the Requirements Contract remains in place between Wypetech and Medline. Ex. 5.  Diversey also references the existence of a contract between it and Wypetech within the July 20 email.

57.     While the July 20 email suggests that Wypetech will continue to operate "as a contract manufacturer" without change following the acquisition, it quickly became apparent that Diversey had been involved in the slowdown of Wypetech's supply of Products to Medline and that Diversey intended to continue to control and direct how Wypetech would dedicate its capacity to fill customer orders in a way that would significantly delay and sharply curtail deliveries to Medline.

*Diversey Confirms Its Interference with Wypetech's Performance*

58.     During calls with Medline representatives on July 22 and 23, 2020, Diversey first offered to allow Wypetech to provide Medline with 7,500 cases per month to fulfill the previously accepted Medline purchase orders. Subsequently, Diversey increased the number of Products to approximately 10,000 cases per month but indicated that was the ceiling of what Diversey would allow Wypetech to manufacture for Medline.

59.     Wypetech, acting under the influence of Diversey and Melchior, initially indicated that it would only commit to additional deliveries if Medline waived its rights with respect to Wypetech's breaches of the Requirements Contract, and accepted an artificial limit on product deliveries.  Further, Diversey indicated that if Medline continued to press its rights in court, Diversey would terminate its contractual relationship with Medline as a supplier of other products. Medline rejected these abhorrent demands and insisted that Wypetech deliver as much Product as it could to meet Medline's purchase orders without waivers, additional agreements, or improper attempts to link delivery of the Products to other unrelated relationships.

60.     Medline informed defendants that given the timing of Wypetech's failure to deliver Products to Medline, it was obvious the conduct was not accidental, but premeditated and intentional and intended to sabotage Medline's disinfectant wipe business.

61.     Diversey did not claim that Wypetech lacked production capacity to provide Medline with its requirements for Products, as the Requirements Contract obligates Wypetech to do.  To the contrary, during these calls, Diversey asserted that while Wypetech's production capacity was as many as 200,000 cases of disinfectant wipes per month, capacity is currently being limited by component supply issues (citing only receiving 45-60% of quantities for full capacity).

62.     Even if operating at 45% capacity (90,000 cases of wipes per month), by honoring its obligations under the Requirements Contract to dedicate its capacity to Medline, Wypetech would be able to fill Medline's purchase orders going forward and address the backlog of unfilled orders in a matter of months.

63.     Furthermore, Medline has recently learned that Wypetech is currently operating its manufacturing lines twenty-four hours a day, six days a week.  This operating schedule, which is an increase from the schedule in place during April (when Wypetech delivered 60,000 cases to Medline) contradicts Diversey's representations that Wypetech's manufacturing capacity is constrained by its inability to obtain component supplies.

64.     It is clear, as Diversey indicated in its communications, that the remainder of Wypetech's business operations will be "integrat[ed] . . . into Diversey." (Ex. 3.)  The Wypetech-Medline supply relationship is thus turned on its head.  Prior to the interference, Wypetech dedicated the bulk of its manufacturing capacity to Medline as provided by the Requirements Contract.  Orders from Wypetech's other customers were filled with whatever capacity remained after Medline's requirements were met.  As a result of Diversey's interference, Wypetech, has indicated, that at best, it will only dedicate approximately 10% of its manufacturing capacity to Medline so that Diversey can control the remaining 90%.  Therefore, although Wypetech's interests would be served by honoring its obligations under the Requirements Contract, Diversey is using its new-found controlling influence to substitute its interests for the interests of Wypetech.

### *Diversey and Melchior Have Interfered – And Continue To Interfere –*
### *With Wypetech's Performance*

65.     The interference by Diversey and Melchior with the Medline-Wypetech relationship began as early as April or May, 2020.  On information and belief, following its offer

to acquire Wypetech's membership interests, Diversey and Melchior forced Wypetech to prefer Diversey's orders to Medline's orders.

66.    On information and belief, the vast majority of the activity related to Diversey's acquisition of Wypetech and interference with the Wypetech-Medline relationship occurred in Wisconsin. Specifically, Diversey engaged in numerous communications with Wypetech, via phone, email, virtual meeting platforms and in-person meetings that took place in Milwaukee, that were in connection with – and in furtherance of – Diversey's interference.

67.    For example, Diversey drafted the content of the July 9 email sent by Wypetech to Medline (confirming that Wypetech would no longer receive purchase orders) and instructed Wypetech to send the message verbatim. Diversey subsequently followed up in an email to Wypetech to confirm that Wypetech had sent the message (as Diversey had directed) and to verify that Wypetech had received no new purchase orders.

68.    Diversey has also engaged in additional conduct in Wisconsin in connection with its interference. Medline learned that Diversey induced Wypetech to manufacture (in Wisconsin) for Diversey, and Diversey has sold those wipes to Medline. In other words, Diversey is not only blocking Wypetech from manufacturing Medline-branded wipes, it is also causing Wypetech to use its manufacturing capacity in Wisconsin (capacity formerly devoted to Medline's wipe requirements) to manufacture Diversey-branded wipes and is selling Medline products which are the result of its tortious inference with the Requirements Contract

69.    Furthermore, on information and belief, based on communications with other players in health care industry, Diversey is offering to supply health care providers with disinfectant wipe products in exchange for their agreement to enter into two year contracts with

19

Diversey obligating the providers to purchase a variety of products – not limited to wipes – from Diversey.

### *Medline has no Adequate Remedy at Law for Wypetech's Repudiation of the Requirements Contract because of Diversey and Melchior's Interference*

70.     Now that Medline has been made aware of Wypetech's repudiation of the contract based on the interference by Diversey and Melchior, Medline has begun to search for an alternate supplier with whom it can enter into a substitute requirements contract for disinfectant wipes.

71.     Even in the absence of unrestrained demand for disinfectant wipe products, such a contract would take months to negotiate and implement. Given initial conversations with wipe fabric suppliers and current market conditions, it's unlikely that Medline will be able to obtain a contract until sometime in 2021 at the very earliest.

72.     At the moment, Medline has no alternate supplier for the Products, and is unable to meet its customers' needs for Medline's disinfectant wipes, compromising Medline's hospital and nursing home customers' ability to fulfill the crucial disinfection function that keeps patients safe.

73.     Diversey and Melchior's interference threatens the reputation and goodwill of Medline, as it currently cannot timely fulfill the outstanding orders for Products its customers have already placed.  So that its customers would not be waiting for Products that might never be delivered, Medline was forced to cancel outstanding orders for Products and inform its customers that it could not make any representations of when sufficient supply would allow orders to be filled in the future.  Despite the cancellation of orders, demand for Products remains high.  Customers continue to inquire regarding whether Products are available. Medline is confident that it has customer demand for all of the Products it has ordered from Wypetech and will order through August of 2021.  Medline's customers are in acute need of these critical cleaning supplies, and if they are forced to seek a new supplier during this time of crisis, they may never return to Medline

even after Medline finds a replacement manufacturer for Wypetech. Further, Medline's reputation in the industry will be irreparably harmed if it is unable to provide these supplies when its customers need them the most.

### Diversey and Melchior Are Liable for Medline's Attorneys' Fees Incurred in Litigation Against Wypetech

74.     Wisconsin recognizes an exception to the American Rule on recovery of attorneys' fees, which is referred to as the "third-party litigation exception" and/or "the *Weinhagen* rule." The exception applies where the wrongful acts of the defendant have involved the Plaintiff in litigation with others or placed him in such relation with others as to make it necessary to incur expense to protect his interest. In cases such as this, the costs and expense of the litigation against the third parties is treated as the legal consequences of the original wrongful act.

75.     On July 28, 2020 Medline was forced to file a lawsuit against Wypetech and Diversey to protect its interests, 20-CV-4424 in the Northern District of Illinois. Diversey was dismissed from the matter without prejudice for lack of personal jurisdiction over Diversey in Illinois.

76.     Diversey has repeatedly asserted that despite purchasing the membership interests in Wypetech, Diversey and Wypetech remain separate companies and Diversey is not a party to the Requirements Contract.

77.     The Northern District of Illinois case is proceeding against Wypetech. Medline has been forced to incur tens of thousands of dollars of legal fees to protect its interests as a result of the actions by Diversey and Melchior.

## COUNT I

*(Tortious Interference with a Contract Before Diversey's Purchase of Wypetech's Membership Interests)*

78.     As and for its Paragraph 78, Medline adopts and incorporates Paragraphs 1 through 77 as if fully restated herein.

79.     The Requirements Contract is a valid and enforceable contract between Medline and Wypetech.

80.     At all times relevant to this dispute, Diversey and Melchior were aware of the existence of the contractual relationship between Medline and Wypetech.

81.     Medline has fully complied with the terms of the Requirements Contract.

82.     Diversey and Melchior intentionally and unjustifiably induced Wypetech to breach the Requirements Contract by improperly using their influence to substitute their interests for the interests of Wypetech.

83.     Prior to Diversey and Melchior's interference with the Wypetech-Medline relationship, Wypetech was working in good faith to fill Medline's purchase orders.  Wypetech made it clear to Medline, its best customer, that Wypetech wanted Medline to continue, not decrease or limit, the pace of its purchase orders.

84.     That all changed in the weeks leading up to Diversey's acquisition of the Wypetech membership interests.  In that May-June time period, Wypetech failed to fill Medline orders, claiming the shortage was due to its inability to obtain component supplies -- an excuse that Diversey echoed following the acquisition.

85.     The slow down and eventual cessation of Wypetech's deliveries of Product to Medline was contrary to the best interest of Wypetech.  Instead, Diversey and Melchior injected themselves into the Wypetech-Medline relationship to serve their own benefit and to further their

interests rather than Wypetech's. As such, neither Diversey nor Melchior were privileged or justified to interfere with the Wypetech-Medline contractual relationship.

86.     Melchior acted with an improper motive when he interfered with the Wypetech-Medline relationship. In particular, he sought to further his own individual pecuniary gain at the expense of Wypetech by forcing Wypetech to breach its contract with Medline as part of a plan to sell his personal interest in Wypetech to Diversey. Wypetech would have been better off honoring its contract with Medline, rather than breaching the Medline contract for Melchior's benefit.

87.     By their conduct, Diversey and Melchior intended to injure Medline. They were aware of the Requirements Contract and fully understood that Medline distributes the Products supplied by Wypetech to Medline's hospital and nursing home customers. Diversey, who directly competes with Medline in disinfectant wipe product market, acted with intent to deprive Medline of its supply of a critical product at a critical time. Melchior acted to injure Medline as a way to induce Diversey to purchase his personal interest in Wypetech. Diversey and Melchior knew that by depriving Medline of a critical product at a critical time they would harm Medline's reputation and relationship with its customers.

88.     Diversey and Melchior's actions have caused Wypetech to breach the Requirements Contract.

89.     Specifically, representatives of Diversey have indicated that Wypetech will not promptly satisfy the outstanding backlog in purchase orders. In addition, Wypetech has made clear that, because of the acquisition by Diversey, it will not fill any future purchase orders submitted by Medline.

90.     Medline has been injured by Wypetech's breach of the Requirements Contract. Medline has numerous unfilled purchase orders that have been duly submitted to Wypetech but not filled as set forth in Paragraph 47.

91.     Diversey and Melchior's actions were not privileged, and they were not justified to interfere.

92.     Medline will be unable to readily locate substitute goods to cover for the breach of the Requirements Contract caused by Diversey's actions.

93.     As a result, Medline has suffered not only economic losses, but reputational and relationship damages as well.

94.     Money damages will be insufficient to repair the losses that Medline has suffered as a result of Wypetech's breach of the Requirement Contract, a breach that was caused by Diversey and Melchior.

95.     As a result of the interference by Diversey and Melchior, Medline was forced to bring an action against Wypetech to protect its interests in the Requirements Contract. That lawsuit is ongoing, and Medline is entitled to recover its attorneys' fees and expenses incurred in that lawsuit as damages from Melchior and Diversey.

### **<u>Count II</u>**
*(Tortious Interference with Contract Following Purchase of Wypetech's Membership Interests)*

96.     As and for its Paragraph 96, Medline adopts and incorporates Paragraphs 1 through 95 as if fully restated herein.

97.     Following Diversey's purchase of the membership interests in Wypetech, Melchior and Diversey continued to tortiously interfere with the Requirements Contract.

98.     At all times material Melchior and Diversey were aware of Wypetech's contractual obligations to Medline and aware of Medline's legitimate business interests to be protected by the Requirements Contract.

99.     Diversey and Melchior interfered with Medline's contractual rights when they caused Wypetech to breach the Requirements Contract.  This includes, but is not limited to, that Melchior and Diversey forced Wypetech to (1) refuse to fill Medline's purchase orders; (2) refuse to accept new purchase orders from Medline; (3) devote Wypetech's manufacturing capacity to customers other than Medline; (4) refuse to communicate with Medline regarding its prior of future purchase orders; and (5) falsely claim that supply issues were impeding Wypetech's ability to fulfill Medline's purchase orders.

100.     The interference by Diversey and Melchior was intentional and improper.  Diversey and Melchior knew their actions were substantially certain to result in interference with, and breach of, the Requirements Contract.  The Defendants actions were improper as they caused Wypetech to breach its clear obligations under the Requirements Contract.

101.     By their actions, Diversey and Melchior intended to injured Medline.  They were aware of the Requirements Contract and fully understood that Medline distributes the Products supplied by Wypetech to Medline's hospital and nursing home customers.  Diversey, who directly competes with Medline in disinfectant wipe product market, acted with intent to deprive Medline of its supply of a critical product at a critical time.  Diversey and Melchior knew that by depriving Medline of a critical product at a critical time they would harm Medline's reputation and relationship with its customers.

102.     Melchior and Diversey's actions have caused Wypetech to breach the Requirements Contract.  Specifically, representatives of Diversey have indicated that Wypetech

will not promptly satisfy the outstanding backlog in purchase orders. In addition, Wypetech has made clear that, because of the acquisition by Diversey, it will not fill any future purchase orders submitted by Medline.

103.     Medline will be unable to readily locate substitute goods to cover for the breach of the Requirements Contract caused by Diversey and Melchior's actions.

104.     Diversey and Melchior acted with improper motive in causing Wypetech to breach its contract with Medline and are using the breach to further their own individual pecuniary gain, while leaving Wypetech liable for breaching its contract with Medline.

105.     Defendants' actions of interference were not privileged or justified.

106.     As a result of the interference by defendants, Medline was damaged in an amount to be determined at trial. Medline has also suffered relationship and reputational damages as well.

107.     Money damages will be insufficient to repair the losses that Medline has suffered as a result of Wypetech's breach of the Requirement Contract.

108.     As a result of the interference by Diversey and Melchior, Medline was forced to bring an action against Wypetech to protect its interests in the Requirements Contract. That lawsuit is ongoing, and Medline is entitled to recover its attorneys' fees and expenses incurred in that lawsuit as damages from Melchior and Diversey.

**WHEREFORE**, Medline prays for (1) preliminary and permanent injunctive relief against Diversey requiring that Diversey cease its interference with Wypetech's performance under the Requirements Contract and not accept any products from Wypetech until Medline's purchase orders have been filled; (2) damages in an amount to be established at trial resulting from Diversey and Melchior's actions; (3) punitive damages against Diversey and Melchior; (4) such other and further relief as this Court deems equitable and just.

PLAINTIFF DEMANDS A JURY TRIAL

Date:   October 14, 2020

GASS WEBER MULLINS LLC
Attorneys for Medline Industries, Inc.

*/s/ Ralph A. Weber*
Ralph A. Weber (SBN 1001563)
weber@gwmlaw.com
Stephen T. Trigg (SBN 1075718)
trigg@gwmlaw.com

241 North Broadway, Suite 300
Milwaukee, WI 53202
414-223-3300 T
414-224-6116 F