UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MEDLINE INDUSTRIES, INC.,

               Plaintiff,

                                          Case No. 20-cv-1579-pp

   v.

DIVERSEY, INC.,
and PETER MELCHIOR,

               Defendants.

---

**ORDER GRANTING DEFENDANT MELCHIOR'S MOTION TO DISMISS
COUNTS I, III AND IV OF THE AMENDED COMPLAINT (DKT. NO. 70),
DENYING DEFENDANT MELCHIOR'S MOTION TO DISMISS COUNT II OF
THE AMENDED COMPLAINT (DKT. NO. 70), GRANTING DEFENDANT
DIVERSEY INC.'S MOTION TO DISMISS COUNTS I, III AND IV OF THE
AMENDED COMPLAINT (DKT. NO. 73), DENYING DEFENDANT DIVERSEY
INC.'S MOTION TO DISMISS COUNT II OF THE AMENDED COMPLAINT
(DKT. NO. 73), GRANTING DEFENDANTS' MOTIONS TO STRIKE
PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES (DKT. NOS. 70, 73) AND
STRIKING PARAGRAPHS 107-112 OF THE AMENDED COMPLAINT**

---

## I.    Introduction

On October 14, 2020, the plaintiff filed its original complaint, seeking

injunctive relief and damages. Dkt. No. 1. The complaint alleged two counts of

tortious interference with a contract. Id. at 22-26. On December 1, 2020, the

plaintiff filed an amended complaint. Dkt. No. 52. The amended complaint

alleged four counts: two counts of tortious interference with contract, one

count of injury to business under Wis. Stat. §134.01 and one count of common

law conspiracy. Id. at 32-42. Both defendants since have filed motions to

dismiss the amended complaint. Dkt. Nos. 70, 73.

1

## II.    Facts Alleged in the Amended Complaint (Dkt. No. 52)

### A.    Parties and Important Non-Parties

Plaintiff Medline Industries, Inc., is an Illinois corporation with its principal place of business in Illinois. Dkt. No. 52 at ¶16. It manufactures and distributes medical supplies, including disinfectant wipes. Id. at ¶¶5, 16.

Defendant Diversey, Inc. manufactures and distributes products such as disinfectant wipes across the United States, including in Wisconsin. Id. at ¶17. It is a Delaware corporation with its principal place of business in South Carolina. Id. Diversey is alleged to be the sole member of Wypetech, LLC, a company organized in Wisconsin with its principal place of business there. Id. at ¶19. Wypetech, LLC is a non-party; it manufactures wet wipe products. Id. at ¶19.

The amended complaint states that Melchior "was formerly an owner of Wypetech and its President." Id. at ¶7. He is a citizen of Wisconsin. Id. at ¶18. The amended complaint asserts that Melchior maintained his position as president after Diversey acquired Wypetech. Id. at ¶7. It avers that Melchior owned "100%" of Wypetech's membership interests. Id. at ¶131.

### B.    Requirements Contract

Until June 2020, Wypetech supplied all the plaintiff's Micro-Kill™ Bleach Wipes and Micro-Kill+™ Wipes under a "Requirements Contract" between the plaintiff and Wypetech. Id. at ¶6. The Requirements Contract was originally formed between the plaintiff and Wypetech's predecessor, Multi-Pack, LLC, in August 2014. Id. at ¶28. The plaintiff alleges that in April 2019, it learned from

Wypetech that Wypetech had become the assignee to this contract; the plaintiff alleges that it did not object to this because Wypetech "took over" the Wisconsin-based manufacturing plant where Multi-Pack manufactured the wipes it sold to the plaintiff. Id. at ¶30. The amended complaint alleges that the Asset Purchase Agreement for Wypetech's purchase (presumably from Multi-Pack) stated the following:

> 2.06 Contracts. All rights, title and interest in and to contracts, agreements and other arrangements, whether written or oral ("Contracts"), relating to the ownership and operation of the Business and all other Contracts of Seller set forth on Schedule 7.09 under the heading "Assumed Contracts" (the "Assumed Contracts"). The Assumed Contracts shall not include, however, and Buyer shall not assume any Contract other than the Assumed Contracts, including but not limited to the Contracts listed on Schedule 7.09 under the heading "Excluded Contracts" (collectively the "Excluded Contracts").

Id. at ¶31. The plaintiff understands this language to mean that unless excluded, Wypetech assumed all the contracts listed on Schedule 7.09 and it asserts that the Requirements Contract was not listed on Schedule 7.09. Id.

The plaintiff alleges that as of the date of the amended complaint, Wypetech had "continuously enjoyed the befits [sic] of the Requirements Contract since March of 2019"—not just the plaintiff's business, but business from its customer Cambridge Sensors USA, LLC, for whom Wypetech manufactured a product called "Microdot." Id. at ¶32. The plaintiff explains that Microdot uses the plaintiff's "proprietary bleach formulation" under a subregistration of the Requirements Contract. Id. The plaintiff claims that "Wypetech's ability to make Microdot wipes using [the plaintiff's] solutions arises directly from the Requirements Contract, under which, Wypetech sells

3

Microdot wipes, then pays [the plaintiff] a 4% royalty." Id. The pertinent section of the Requirements Contract states:

> i. 4% of the invoiced purchase price (exclusive of taxes, freight, storage or other similar charges) of any Licensed Product manufactured, packaged and/or sold by Seller to Cambridge Sensors USA, LLC or its affiliates, successors or assigns (the "Cambridge Royalty").

Id.

The plaintiff asserts that defendant Melchior was both a member and president of Wypetech "from the time [Wypetech] became the assignee of the Requirements Contract" until Diversey bought Melchior's membership interests; the plaintiff believes Melchior remained president of Wypetech after Diversey purchased it. Id. at ¶33. When Wypetech accepted reassignment of the Requirements Contract, it was manufacturing certain disinfectant wipe products for the plaintiff under the plaintiff's brand. Id. at ¶34. Upon reassignment, Wypetech and the plaintiff agreed to add several products to the list of products Wypetech already was manufacturing. Id. The Requirements Contract included a process through which the plaintiff communicated to Wypetech its future product demands. Id. at ¶36. The plaintiff first would provide Wypetech with "'non-binding rolling ninety-day forecasts . . . for each of the products.'" Id. It then could submit purchase orders to Wypetech. Id. Wypetech allegedly was obligated to fulfill the purchase orders and the plaintiff was required to purchase the fulfilled orders. Id. The plaintiff also alleges that the Requirements Contract provided that Wypetech would be the exclusive contract manufacturer of those products for the plaintiff and that the plaintiff

4

could not contract with any other party to manufacture or package the products; the plaintiff could seek out another vendor only if its reasonable product requirements exceeded Wypetech's capacity. Id. at ¶38. The plaintiff alleges that the Requirements Contract obligated Wypetech to "dedicate its manufacturing capacity to supply [the plaintiff's] reasonable requirements for all products on [the plaintiff's] purchase orders, provided that those purchase orders do not exceed the Forecasts provided to Wypetech." Id. at ¶39.

The plaintiff alleges that the initial term of the Requirements Contract was five years, through August 2019, after which it would automatically renew in one-year terms unless a party to the contract expressly provided written notice or the contract terminated under its own provisions. Id. at ¶40. The plaintiff says the contract renewed August 2019 through August 2020 and again August 2020 through August 2021; it asserts that because neither party provided notice of non-renewal, "the next renewal term commenced on August 19, 2020 and r[an] through August 19, 2021." Id. at ¶40. The plaintiff concedes that in the summer of 2019, it had had conversations, "both internally and with Wypetech," about the contract, including "discussions of providing notice of non-renewal." Id. at ¶41. But it asserts that it never provided Wypetech written notice that it was not renewing, and states that it told Wypetech that it did not wish to terminate the relationship. Id. The plaintiff alleges that in the contract in which defendant Melchior sold his interest in Wypetech to Diversey, Melchior "expressly warranted that [the plaintiff] had not given notice that it was terminating the Requirements Contract." Id. The plaintiff emphasizes that

5

the Requirements Contract was identified and "forwarded"—though it does not say to whom—as part of the due diligence performed before Diversey bought Melchior's interest in Wypetech. Id. The plaintiff also asserts that Wypetech manufactured and delivered Microdot wipes through at least September 2020, and argues that this shows that the Requirements Contract remained in force as of the date of the amended complaint because Wypetech would have lost its license to manufacture that product had the Requirements Contract terminated in August 2020. Id. at ¶42.

C.     Alleged Breach of the Requirements Contract

The plaintiff alleges that Wypetech and the plaintiff complied with the Requirements Contract from 2017 through 2019. Id. at ¶43. The plaintiff says it paid Wypetech more than $6 million each year for over 180,000 cases of wipes annually. Id. The plaintiff notes, however, that the COVID-19 crisis caused an "explosion" in demand for disinfectant products (particularly wipes), and that as a result, between January and June 2020, the plaintiff ordered over 600,000 cases of disinfectant wipes; the plaintiff asserts that the value of these orders to Wypetech was over $16 million. Id. at ¶44.

The plaintiff says that the increased demand in 2020 created manufacturing challenges—difficulties in obtaining component materials and the need to increase staffing. Id. at ¶45. The plaintiff says it worked closely with Wypetech to make sure Wypetech could keep up with the demand. Id. The plaintiff says that Wypetech was able to fill orders as large as 16,000 cases in a single week, and more than 60,000 cases in the month of April 2020 alone. Id.

The plaintiff asserts that Wypetech did not complain that the demand was unreasonable or suggest that the plaintiff somehow was constrained to order the pre-COVID-19 volume, nor assert that the plaintiff's increased orders were based on anything other than the plaintiff's good-faith need for more product. Id. at ¶46. The plaintiff alleges that in April, at the "zenith of Wypetech's performance," Wypetech asked the plaintiff for additional forecasts and orders for May and June 2020, at levels "approximating April's output level." Id.

The plaintiff alleges, however, that Wypetech's delivery of wipes began to run behind the plaintiff's purchase orders, and that by May 2020, Wypetech's deliveries "were down more than 70% from the prior month to only 17,000 cases." Id. at 47. The plaintiff says that Wypetech's representatives explained that the shortfall was caused by an inability to obtain sufficient component materials, but that they assured the plaintiff that they were working to rectify the problem. Id. at ¶48. The plaintiff asserts that after June 25, 2020, Wypetech stopped all deliveries of disinfectant wipes to the plaintiff, and that it stopped "timely" responding to the plaintiff's emails and phone calls. Id. at ¶50. The plaintiff says that it continued to provide Wypetech with forecasts and purchase orders for 2020 but that Wypetech did not fill those orders. Id. at ¶51.

The plaintiff alleges that August 2020, "acting under the influence of Diversey and Melchior," Wypetech "limited its delivery of Products to Medline to 10,800 cases." Id. at ¶52. The plaintiff believes that was about ten percent of Wypetech's capacity for that month. Id. The plaintiff alleges that, again "acting

7

under the influence of Diversey and Melchior," Wypetech indicated that it would cap shipments to approximately 10,800 cases per month in September and October and would make no assurances of future deliveries. Id. at ¶53. The plaintiff characterizes this amount as "woefully insufficient" to allow the plaintiff to meet its existing purchase orders, and it asserts that the amount did not approach Wypetech's capacity. Id. The plaintiff says that it received zero cases in September 2020. Id. The plaintiff believes that Diversey and Melchior "have forced Wypetech to devote its manufacturing capacity to fulfilling other client's orders before fulfilling its contract with [the plaintiff], or even the belated agreement to provide approximately 10,800 cases per month to [the plaintiff]." Id.

As of the date of the amended complaint, the plaintiff was waiting for Wypetech to fulfill its obligations under the Requirements Contract. Id. at ¶54. It asserts that in the five months "since the Diversey-directed slowdown began," it had received about 25,000 cases of wipes—less than a third of the average pre-pandemic deliveries. Id. at ¶55. Among the outstanding unfulfilled orders were over 650,000 cases of disinfecting wipes. Id. The plaintiff asserts that Wypetech refuses to commit any future capacity to the plaintiff, "making clear its intent to repudiate the Requirements Contract going forward." Id. The plaintiff says that even the wipes Wypetech has delivered represent an over-80% cut in Wypetech's peak 2020 output "prior to the time when Diversey and Melchior began negotiations and supply began to vanish;" the plaintiff asserts

8

that at a rate of 10,800 cases a month, it would take the plaintiff more than five years to fill its existing purchase orders. Id.

D. Diversey and Melchior

The plaintiff says that it couldn't understand why things had broken down with Wypetech, until at some point in early July 2020, a Diversey representative told one of the plaintiff's employees that Diversey was in the process of buying Wypetech from Melchior. Id. at ¶56. The plaintiff characterizes the "content and tone" of that conversation as indicating that "the Diversey representative was aware that Diversey's purchase of Wypetech would not be welcome news to [the plaintiff]." Id. The plaintiff also perceived that the sale had been in the works for some time, "with Diversey and Melchior likely influencing Wypetech's production and output for Product purchasers other than Diversey, including especially [the plaintiff]." Id.

The plaintiff asserts that on July 9, 2020, it received an email from Wypetech stating that Wypetech had been acquired by Diversey, "[the plaintiff's] competitor in the area of disinfectant wipes." Id. at ¶57. The July 9, 2020 email stated that the top priority would be the integration of Wypetech's business into Diversey and that "new purchase orders would not be accepted." Id. at ¶58. The email did not address existing purchase orders. Id. The plaintiff says that within an hour of its receipt of this news, the plaintiff "was further directed to make all further communication with Diversey, not Wypetech." Id. The plaintiff alleges that this was the first time Wypetech had told it not to send purchase orders or hinted that it would not honor its obligations under

9

the Requirements Contract. Id. at ¶59. The plaintiff asked for more information and sought assurances that Wypetech would comply with the Requirements Contract. Id. In an email dated July 20, Diversey responded that it had made a membership purchase and that Melchior would continue as president of Wypetech and be responsible for its day-to-day operations. Id. at ¶60. The plaintiff says that this email referred to the Requirements Contract and "expresse[d] Diversey's understanding that the Requirement Contract remain[ed] in place between Wypetech and [the plaintiff]," and that the email referenced a contract between Diversey and Wypetech. Id. at ¶61. The plaintiff claims that it "quickly became apparent that Diversey had been involved in the slowdown of Wypetech's supply of Products to [the plaintiff] and that Diversey intended to continue to control and direct how Wypetech would dedicate its capacity to fill customer orders in a way that would significantly delay and sharply curtail deliveries to [the plaintiff]." Id. at ¶62.

The plaintiff alleges that its representatives had phone calls with Diversey on July 22 and 23, 2020. Id. at ¶63. The plaintiff says that during those phone calls, Diversey offered to allow Wypetech to provide 7,500 cases per month to the plaintiff to fulfill previous purchase orders. Id. Later, Diversey increased that number to 10,800 cases per month but indicated that that "was the ceiling of what Diversey would allow Wypetech to manufacture for [the plaintiff]." Id. The plaintiff alleges that "acting under the influence of Diversey and Melchior," Wypetech initially indicated that it would commit to additional deliveries only if the plaintiff waived its rights with respect to Wypetech's

10

breaches of the Requirements Contract and "accepted an artificial limit on product deliveries." Id. at ¶64. The plaintiff contends that Diversey threatened to terminate its contract with the plaintiff to supply other products if the plaintiff "continued to press its rights in court." Id. The plaintiff says that it rejected these demands and insisted that Wypetech deliver as much product as it could without any waivers, additional agreements or linkage to delivery of other products. Id. The plaintiff says it told the defendants that it believed their conduct "was not accidental, but premeditated and intentional and intended to sabotage [the plaintiff's] disinfectant wipe business." Id. at ¶65.

The plaintiff alleges that during the July 22 and 23 phone calls, Diversey asserted that Wypetech's production capacity was "as many as 200,000 cases of disinfectant wipes per month," but Diversey asserted that "capacity is currently being limited by component supply issues (citing only receiving 45-60% of quantities for full capacity)." Id. at ¶66. The plaintiff asserts that even operating at 45% capacity (which the plaintiff calculates at 90,000 cases of wipes per month), Wypetech could have honored the Requirements Contract and filled the plaintiff's going-forward orders and its backlog in a matter of months. Id. at ¶67. The plaintiff says that it has "learned" that Wypetech "is currently operating its manufacturing lines twenty-four hours a day, six days a week," and asserts that this schedule is an increase from the April schedule, in which Wypetech delivered the plaintiff 60,000 cases. Id. at ¶68. The plaintiff concludes from all this that Diversey has interfered with Wypetech's

11

relationship with the plaintiff "to substitute its interests for the interests of Wypetech and harm [the plaintiff]." Id. at ¶69.

E.    Alleged Interference

The plaintiff alleges that Diversey and Melchior began to interfere with the Wypetech/plaintiff relationship around April or May 2020, when it says that after offering to acquire Wypetech's membership interests, Diversey and Melchior "forced Wypetech to prefer Diversey's orders to [the plaintiff's] orders." Id. at ¶70. The plaintiff describes Wypetech as a "co-packer," a company that sources raw materials to create and package products for other companies. Id. at ¶71. It asserts that because the pandemic has caused demand for the products the plaintiff and Diversey sell to far exceed what Wypetech and others can supply, "by purchasing Wypetech and cutting of [the plaintiff's] orders, Diversey crippled [the plaintiff[ and harmed Wypetech." Id. The plaintiff alleges that months before Diversey bought Wypetech's membership interests, it "inserted itself into Wypetech's production planning and worked with Melchior to divert capacity towards producing wipes for Diversey." Id. at ¶72. It asserts that as early as April 2020, Wypetech and Diversey talked about increasing Wypetech's production of wipes for Diversey. Id. "Diversey explained in an April 20, 2020 email that it relied almost exclusively on outsourced production for its wipes in the United States and was 'looking to rebalance this via acquisitions or organic build.'" Id.

The plaintiff asserts that in late April and early May, Diversey and Wypetech were talking about the fact that Diversey wanted to acquire

Wypetech so that Wypetech "could manufacture the wipes that were currently outsourced to other manufacturers." Id. at ¶73. The plaintiff says that "Melchior recognized the problem right away—what about production already committed to Wypetech's existing customers?" Id. So, the plaintiff alleges, "one of the first issues Melchior wanted to discuss on May 18, 2020, with Diversey was its plans for Wypetech's customers and the purchase orders they had already submitted, and to emphasize that Melchior could help drive production for Diversey." Id. The plaintiff quotes something—it does not identify the source—in which someone, speaking in the first person (presumably Melchior) asks whether the plan would be to cancel all current purchase orders to make room for Diversey orders. Id. The plaintiff quotes a May 4, 2020 email from Diversey's vice president of corporate development, asking someone (presumably Melchior) how long it would take to switch the current customer base to internal supply, and speculating that "you might have some long term contracts." Id. at ¶74.

The plaintiff alleges that Diversey was "interested in" Wypetech's contract with Kimberly-Clark, the company that manufactured the fabric substrate that Wypetech used to create both the plaintiff's and Diversey's wipes. Id. at ¶76. The plaintiff alleges that the parties "wanted to know if Wypetech could maintain and expand the Kimberly Clark contract if Diversey acquired Wypetech." Id.

The plaintiff asserts that prior to Diversey's purchase of the membership interest, Diversey and Wypetech personnel spoke frequently regarding

13

Wypetech's production. Id. at ¶77. It recounts the activity—conversations, meetings, due diligence and other activities—in support of this assertion. Id. at ¶¶78-84. It asserts that "[o]n June 17, 2020, Diversey scheduled a call with Melchior to get his '*view on customers/timing and **how to get out of [purchase orders]**.*'" Id. at ¶81. It points to efforts that Melchior and Diversey made to obtain component materials, materials the plaintiff asserts "could have (and should have) gone to producing" the plaintiff's products. Id. at ¶82. The plaintiff says that all of this information shows that "even before the closing of the transaction, Diversey and Melchior were prioritizing materials for Diversey's wipes and placing Wypetech's longstanding top customer, [the plaintiff], on allocation." Id. at ¶84. The plaintiff details its beliefs about Wypetech's production capacity, explains how Wypetech "gladly supplied [the plaintiff's] needs . . . and eagerly sought and accepted more [of the plaintiff's] orders," then notes the change after Diversey entered the equation. Id. at ¶¶86-87. It notes the timing—that Wypetech started increasing production for Diversey "at the exact time the negotiations between Diversey and Wypetech began to heat up." Id. at ¶88.

The plaintiff alleges that Diversey and Wypetech began discussions on increasing production of Diversey's products as early as April 2020. Id. at ¶72. In early May 2020, Diversey emailed Melchior asking about the timing of switching Wypetech's customer base to Diversey's internal supply. Id. at ¶74. Melchior allegedly responded that it would be efficient to produce mainly Diversey products. Id. The parties explicitly discussed the number of wipes

14

Wypetech could produce for Diversey. Id. at ¶77. The plaintiff says that Diversey took interest in other portions of Wypetech's manufacturing process as well as how it would relate to Diversey's products. See id. at ¶76.

The plaintiff also alleges that Diversey "is aggressively and improperly using Wypetech's production capacity, capacity that is committed to [the plaintiff] by the Requirements Contract but is not being used for that purpose, in a targeted effort to lock [the plaintiff's] wipes customers into long-term supply agreements with Diversey." Id. at ¶94. The plaintiff says that although Diversey knows that the plaintiff has no wipes to sell customers "due to Diversey's improper interference," Diversey is offering to sell the plaintiff's customers Diversey wipes (some made by Wypetech). Id. at ¶95. The plaintiff says it has learned that Diversey is conditioning this supply offer on the customers' agreement to execute long-term supply contracts with Diversey; the plaintiff thinks at least two of its customers have discussed such arrangements with Diversey. Id.

The plaintiff says that it has been searching for an alternate supplier. Id. at ¶98. It says, however, that such a contract would take months to negotiate and implement. Id. at ¶99. It says that as of the date of the amended complaint, it had no alternate supplier, that its ability to supply hospital and nursing home customers was impaired (threatening the well-being of patients) and that its reputation and goodwill were at risk. Id. at ¶¶100-101. It has been forced to cancel outstanding orders, despite continuing high demand. Id. at ¶101. It says it stands to lose market share and potential future sales. Id. at

15

¶103. It cannot provide proposals to customers seeking product bundles and its ability to cross-sell other products is impacted. Id. at ¶¶104-105.

F.    Attachments

The plaintiff attached to the amended complaint the August 19, 2014 agreement between the plaintiff and Multi-Pack (Dkt. No. 52-1); a product list (Dkt. No. 52-2); the plaintiff's pricing lists (Dkt. Nos. 52-3 and 52-4); an April 2, 2019 letter from Melchior advising customers that Multi-Pack had been sold to Wypetech (Dkt. No. 52-5); a July 9, 2020 email from an account manager at Wypetech notifying the plaintiff's representatives that Wypetech had been acquired by Diversey (Dkt. No. 52-6); a July 9, 2020 email from Melchior to the plaintiff's representatives indicating that all correspondence between the plaintiff and Wypetech needed to go through someone named Barb Lukas (Dkt. No. 52-7); July 17-20, 2020 emails between Diversey representatives and representatives of the plaintiff (Dkt. No. 52-8); a June 20, 2020 email from Melchior to various people (Dkt. No. 52-9); and the March 5, 2019 asset purchase agreement between Wypetech and Multi-Pack (Dkt. No. 52-10).

III.   **Litigation History**

On July 28, 2020—about two and a half months before filing this lawsuit in the Eastern District of Wisconsin—the plaintiff sued Diversey Inc. and Wypetech LLC in the Northern District of Illinois.[1] Medline Indus., Inc. v. Diversey, Inc., et al., Case No. 20-cv-4424 (N.D. Ill.). Melchior was not a

---

[1] In the amended complaint, the plaintiff asserts that it was "forced to file" this lawsuit "to protect its interests." Dkt. No. 52 at ¶¶110, 135.

16

defendant in that case; Diversey was dismissed for lack of personal jurisdiction. In October 2020, around the time the plaintiff filed the original complaint in Wisconsin federal court, the parties were scheduled in the Illinois case for expedited briefing on the question of whether the plaintiff's non-renewal motion was privileged; they were in dispute over the Rule 30(b)(6) deposition questions and they were under a briefing schedule for the motion for preliminary injunctive relief. Id. at Dkt. No. 170. On April 21, 2021, the parties jointly moved to dismiss the case with prejudice. Id. at Dkt. No. 437. The Illinois court granted that motion. Id. at Dkt. No. 438.

By that time, the motions to dismiss in this case had been fully briefed. The plaintiff had withdrawn its request for injunctive relief in this case. Dkt. No. 119.

**IV.  Analysis**

A.  Legal Standard

Both defendants move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Dkt. Nos. 70, 73. "Evaluating the sufficiency of a complaint is not a 'fact-based' question of law." Ashcroft v. Iqbal, 556 U.S. 662, 674 (2009). When evaluating a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiffs' favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011). It is not necessary for the complaint to contain "detailed factual allegations," but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678

17

(citing <u>Bell Atl. Corp. v. Twombley</u>, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." <u>Carlson v. CSX Transp., Inc.</u>, 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting <u>Swanson v. Citibank, N.A.</u>, 614 F.3d 400, 404-05 (7th Cir. 2010)). "[T]he proper question to ask is still could these things have happened, not did they happen." <u>Id.</u> at 827 (internal quotation and citation omitted). The plaintiff "need not 'show' anything to survive a motion under Rule 12(b)(6)—he need only allege." <u>Brown v. Budz</u>, 398 F.3d 904, 914 (7th Cir. 2005).

In ruling on a motion to dismiss, the court must accept as true all the factual allegations in the complaint. <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (2007) (citing <u>Twombley</u>, 550 U.S. at 555-56). It must draw all reasonable inferences in favor of the plaintiff. <u>Marquez v. Weinstein, Pinson & Riley, P.S.</u>, 836 F.3d 808, 810 (7th Cir. 2016). A court may grant a Rule 12(b)(6) motion to dismiss when "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." <u>Wilson v. Price</u>, 624 F.3d 389, 392 (7th

18

Cir. 2010) (quoting <u>Kennedy v. Nat'l Juvenile Det. Ass'n</u>, 187 F.3d 690, 694

(7th Cir. 1999)).

     B.    <u>Melchior's Motion to Dismiss (Dkt. No. 70)</u>

          1.    *Count I: Tortious Interference with a Contract Before*
               *Diversey's Purchase of Wypetech's Membership Interests*

Count I of the amended complaint alleges that Diversey and Melchior

tortiously interfered with the Requirements Contract before Diversey purchased

Wypetech. Dkt. No. 52 at 32.

> A claim for tortious interference with a contract has five elements:
> (1) the plaintiff had a contract or a prospective contractual
> relationship with a third party; (2) the defendant interfered with the
> relationship; (3) the interference was intentional; (4) a causal
> connection exists between the interference and the damages; and (5)
> the defendant was not justified or privileged to interfere.

<u>McLain v. Keenan</u>, 962 N.W.2d 267, ¶56 (Table) (Wis. Ct. App. May 20, 2021)

(citing <u>Brew City Redevelopment Grp., LLC v. Ferchill Grp.</u>, 297 Wis.3d 606

¶37 n.9 (Wis. 2006); <u>Briesmeistser v. Lehner</u>, 295 Wis. 2d 429 ¶48 (Wis.Ct.

App. 2006)).

          a.    Melchior's Ability to Interfere with a Contract between
               the Plaintiff and a Company Melchior Wholly Owned
               and Operated

Melchior first argues that he could not interfere with a contract to which

a company he wholly owned and operated was a party.[2] Dkt. No. 71 at 10.

---

[2] Melchior states in his motion that he was the "former sole owner" of
Wypetech, and that before July 1, 2020, he was the sole member of Wypetech.
Dkt. No. 71 at 9. Melchior cites several paragraphs of the amended complaint
in support of these assertions—paragraphs 6, 7, 8, 19 and 70. <u>Id.</u> None of
these paragraphs state that Melchior was the "sole" owner or the "sole" member
of Wypetech. There *is* a paragraph in the amended complaint in which the
plaintiff concedes that "Melchior owned 100%" of Wypetech's membership

Citing both Seventh Circuit and Wisconsin precedent, Melchior argues that "[a] party to a contract cannot be liable for tortiously inducing himself to breach. . . . Only a third party, separate from the contracting parties, can be liable for tortious interference." Id. at 11 (citing Joseph P. Caulfield & Assoc., Inc. v. Litho Products, Inc., 155 F.3d 883, 889 (7th Cir. 1998); Wausau Med. Center, S.C. v. Asplund, 182 Wis. 2d 274, 297 (Wis. Ct. App. 1994)). He asserts that he cannot be held liable for interfering with the Requirements Contract because the amended complaint shows he "had the power and final managerial authority, as President and sole member of Wypetech, to enter into, assume, perform, or decide not to perform Wypetech's contracts." Id. at 12.

The plaintiff responds that under Wisconsin law, corporate owners "can interfere with the contracts of their wholly owned companies and act to their detriment." Dkt. No. 91 at 18-19. The plaintiff asserts that the test is whether the owner of the corporation "acted with an improper motive." Id. at 19 (citing Sprecher v. Weston's Bar, 78 Wis. 2d 26, 31-32, 41-42 (Wis. 1977)). The plaintiff asserts that "improper motive" includes "individual pecuniary gain of the owners . . . to the detriment of their corporations." Id. (citing Sprecher, 78 Wis. 2d at 38-42). The plaintiff argues that it alleged "improper motive" in the

---

interests. Dkt. No. 52 at ¶131. In opposition to the now-withdrawn motion for injunctive relief, Melchior filed a declaration under 28 U.S.C. §1746, dated December 3, 2020, in which he averred that prior to July 1, 2020, he was the president and sole member of Wypetech and had been since March 2019. Dkt. No. 66 at ¶3. While, as the court will discuss in this order, the plaintiff argues that people other than Melchior acted on behalf of Wypetech in various circumstances, the plaintiff has not disputed that Melchior was the only member and owner of Wypetech.

20

amended complaint by describing how Melchior "caused Wypetech to breach the Requirements Contract for his own individual pecuniary gain while he was negotiating with Diversey regarding the sale of his membership interests." Id. at 21 (citing dkt. no. 52 at 70-82, 84, 87-90, 121-22).

In his reply brief, Melchior characterizes the plaintiff's arguments as attempts to "pin individual liability on [Melchior] for an alleged breach of contract between Medline and Wypetech, LLC." Dkt. No. 102 at 6. He distinguishes Sprecher, arguing that it did not involve a tortious interference claim but a circumstance in which the court pierced the corporate veil to hold individual shareholders liable in contract. Id. at 10. He also distinguishes another case relied upon by the plaintiff, Fabert v. Hot Spur Partners, LLC, 287 Wis. 2d 827 (Wis. Ct. App. 2005). Id. Melchior argues that the Fabert court "relied entirely on the fact that the individual defendant *did not* solely own the LLC" in resolving the issue at stake in that case. Id. at 10-11. Melchior points the court back to Wausau Med. Center and similar cases. Id. at 11.

Melchior lists multiple cases in support of his position that he could not have tortiously interfered with a contract between the plaintiff and Melchior's wholly-owned company. The earliest is a Seventh Circuit decision, Rao v. Rao, 718 F.2d 219 (1983), a case involving Illinois law. Dkt. No. 71 at 11. Mohan Rao, a surgeon who was the sole officer, director and shareholder of Mohan Corporation, entered into an employment agreement with Hari Rao, another surgeon. Rao, 718 F.2d at 221. The agreement provided that if it was terminated, Hari could not practice medicine in any capacity at certain

21

hospitals for two years after termination. Id. Mohan later terminated the agreement, then sued for specific enforcement of the non-compete. Id. Hari countered that Mohan (as an individual) had tortiously induced Mohan Corporation to breach its contractual duty to Hari. Id. The Seventh Circuit flatly rejected Hari's tortious interference claim, stating that "it is clear that a party to a contract cannot be held liable for tortiously inducing himself to breach the contract." Id. at 225 (citations omitted). It stated:

> Only a third party separate from the contracting parties can be liable for such a tort. See B.R. Paulsen & Co. v. Lee, 95 Ill.App.2d 146, 152, 237 N.E.2d 793, 796 (1968); see also Olson v. Scholes, 17 Wash.App. 383, 563 P.2d 1275, 1280 (1977). Mohan Corporation acts only through Mohan; the corporation could not form or breach contracts without Mohan's involvement and, in a very real sense, Mohan is a party to the employment agreement in this case. See West v. Troelstrup, 367 So.2d 253, 255 (Fla.App. 1979). Because Mohan is Mohan Corporation's sole shareholder, officer, and director, therefore, we are convinced that Mohan would be considered by an Illinois court not to be a separate entity capable of inducing Mohan Corporation to breach its contracts.

Id.

Seven years later, the Seventh Circuit reiterated the principle that one cannot tortiously interfere with one's own contract in a complex suit between a company established to create a hotel in Racine, Wisconsin ("Racine") and the hotel management company it hired to build and operate the hotel ("Olympia"). Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363 (7th Cir. 1990). The facts relevant to the tortious interference issue were these:

> The last question we discuss is whether the district court was correct to withdraw the issue of civil conspiracy from the jury, on the ground that Olympia had failed to present sufficient evidence to warrant a reasonable jury in finding an actionable conspiracy. When Racine soured on Olympia it approached another hotel management

22

concern, Aircoa, with which it signed a contract for hotel management services that was expressly contingent on Racine's terminating its contract with Olympia. Olympia claims that Aircoa and Racine had agreed *sotto voce* that, if necessary, Racine would cancel the contract on trumped-up charges.

Id. at 1374. The Seventh Circuit agreed with the district court that Olympia had not proven a conspiracy; while it had proven a contract between Racine and Aircoa that was contingent on termination of the contract with Olympia, and while perhaps a jury might conclude that Racine was determined to get out of that contract one way or another, "the conspiracy charged [was] a conspiracy to tortiously interfere with Racine's contract with Olympia." Id. at 1374-75. The Seventh Circuit said, "You cannot interfere tortiously with your own contract, so the conspiracy had to be that Aircoa would interfere tortiously; but there is not the slightest evidence that Aircoa intended or agreed to do anything more than sign with Racine if Racine managed to get out of its contract with Olympia." Id. at 1375.

It was four years later, in Wausau Medical Center, that the Wisconsin Court of Appeals considered the issue applying Wisconsin law. Defendant Asplund had entered into a non-compete agreement with plaintiff Wausau Medical Center ("WMC"). Wausau Medical Center, 182 Wis. 2d at 279-80. Asplund later gave sixty days' notice that he planned to terminate his employment, formed a service corporation (Mark Asplund, S.C.) while still working for the plaintiff and, after leaving the plaintiff, began his own medical practice as an employee of that corporation. Id. at 280. Asplund later sued to have the non-compete declared unenforceable, and WMC filed a counterclaim

23

and third-party complaint; when Asplund dismissed his claim voluntarily,

WMC became the plaintiff and Asplund moved for summary judgment. Id. The

trial court granted Asplund's motion. Id.

WMC argued on appeal that the service corporation (Mark Asplund, S.C.)

tortiously interfered with the contract between Asplund and WMC. Id. at 296.

The court of appeals found, as had the trial court, that WMC was "using a legal

fiction, that a corporation is a separate person, to prove facts necessary for its

arguments." Id. The court of appeals reasoned that

> [w]ith regard to WMC's contention that Asplund's service
> corporation tortiously interfered with the contract between Asplund
> and WMC, we . . . conclude that because Asplund and his service
> corporation are in effect the same person, this cause of action
> cannot stand. Tortious interference with a contract occurs when
> someone "intentionally and improperly interferes with the
> performance of a contract . . . between another and a third person
> by inducing or otherwise causing the third person not to perform the
> contract . . . ." *Charolais Breeding Ranches, Ltd. v. PFC Secur. Corp.*,
> 90 Wis.2d 97 . . . (Ct. App. 1979) (quoting RESTATEMENT (SECOND) OF
> TORTS § 766 at 7 (1979)). To argue that the service corporation
> interfered with the contract between WMC and Asplund is to say
> that Asplund interfered with the contract by inducing himself not to
> perform the contract. Because Asplund's interference with his own
> contract with WMC is not an action encompassed by a tortious
> interference with contract cause of action, we affirm the trial court's
> grant of summary judgment on this issue.

Id. at 297. Four years later, in Joseph P. Caulfield & Assoc., Inc. v. Litho

Prods., Inc., 155 F.3d 883, 889 (7th Cir 1998), the Seventh Circuit cited to the

Wausau Medical Center holding in rejecting a plaintiff's claim that the

defendant conspired with others to interfere with a contract, reasoning that

"because a party cannot interfere tortiously with its own contract, there is

arguably a logical inconsistency in claiming [the defendant] conspired with others to interfere with its own contract." (citing to Wausau Medical Center).

These cases support Melchior's argument that as the sole member of Wypetech, he could not tortiously interfere with Wypetech's contract with the plaintiff. He adds, however, that under Wis. Stat. §183.0304, "a member or manager of a limited liability company is not personally liable for any debt, obligation or liability of the limited liability company, except that a member or manager may become personally liable by his or her acts or conduct other than as a member or manager." Dkt. No. 71 at 13. The plaintiff points to the Wisconsin Supreme Court's decision in Brew City, 297 Wis. 2d at 625 n.10, in which the court found that to the extent that a defendant's "actions are performed as a member or manager of" the LLC, "he will not be liable individually for interference with that contract under § 183.0304."

The plaintiff responds that "Wisconsin law recognizes that corporate owners can interfere with the contracts of their wholly owned companies and act to their detriment," and it cites Sprecher. Dkt. No. 91 at 18-19. Albert and Alma Sprecher owned a bar in Prairie du Sac; Albert was the licensing agent for the corporation, which held a class B liquor license. Sprecher, 78 Wis. 2d at 30-31. In 1964, Albert and Alma sold the bar to the Westons but retained ownership of the building that housed it. Id. at 31. The name changed to Weston's Bar and later, the village board granted Weston's Bar, Inc. a liquor license. Id. The parties entered into yearly leases for the building; the leases— particularly the one for 1969-1970—provided that at termination of the lease

25

and on request of the lessor, the lessee would deliver to the lessor all liquor licenses in the lessee's possession. Id. In the fall of 1969, the Westons bought the building and lot next door to the building they were leasing from the Sprecher's. Id. In December 1969, Weston's Bar, through the Westons themselves, applied to the village board to have the liquor license transferred from the Sprecher building to the new building, and the board approved the transfer. Id. The Sprechers sued for an injunction to restrain the Westons from trying to have the liquor license transferred from the Sprecher building to the Weston building. Id. at 32.

One of the issues on appeal was whether "the facts of this case justify holding the corporate-shareholder/officer-defendant, Julia A. Weston, individually and personally liable for the damages incurred by the plaintiff?" Id. at 33. Julia had signed the lease as an officer of Weston's Bar, Inc. and not in her individual capacity. Id. at 37. The issue, then, was "whether under these circumstances liability can nevertheless be imposed upon Julia A. Weston, individually;" the trial court had said that it could be, relying in part on the doctrine of the piercing of the corporate veil and in part of the theory that Julia individually caused the corporation to breach the lease contract. Id.

The court first noted its long-held position that "a corporation is treated as an entity separate from its shareholders under all ordinary circumstances and thus that contracts entered into for the corporation by its officers or agents are contracts of the corporation as a distinct legal entity and neither confer rights nor impose liabilities on the shareholders individually." Id. (citations

26

omitted). The court explained, however, that there were exceptions to that principle, one of which was a situation in which "it appears that a person 'is simply dealing with his own property through a corporate agency as absolutely as he might deal with it as an individual,'" and observed that if in such a case "applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim, the fiction is disregarded and the transaction is considered as one of the individual himself or of the corporation, whichever will prevent the inequitable result." Id. at 38 (citations omitted). The Supreme Court agreed with the trial court that the facts warranted disregarding the corporate fiction and holding Julie Weston individually liable. Id. at 39. It concluded that Julie Weston induced the corporation to breach the lease contract based on an "improper motive"—her own pecuniary gain, "not merely as a shareholder." Id. at 40-41.

But the amended complaint in this case does not allege that the court ought to pierce the corporate veil and find that Melchior caused Wypetech to breach the Requirements Contract. The plaintiff has alleged that Melchior tortiously interfered with the contract between the plaintiff and Wypetech. The plaintiff appears to forget this; it argues in its opposition brief that Melchior "caused Wypetech to breach the Requirements Contract" to further Melchior's interests. Dkt. No. 93 at 22. But that is not what the plaintiff alleged in the amended complaint. The plaintiff's reliance on Sprecher is misplaced, given the plaintiff's choice to pursue a tortious interference with contract claim against Melchior, rather than a breach of contract claim via a veil-piercing theory.

27

The plaintiff also cites Fabert, a 2005 decision by the Wisconsin Court of Appeals. Dkt. No. 93 at 19. Plaintiff Fabert formed a limited liability corporation, Hot Spur Partners, LLC, with Richard Beere for the purposes of buying, selling, training, racing and stabling horses. Fabert, 287 Wis. 2d at ¶3. Beere and Fabert were the only sole members and "initial managers" of Hot Spur Partners and Beere owned 99% of the LLC; there was an operating agreement providing that electing or removing a manager, or entering into an employment agreement with anyone, required the prior approval of members who owned more than 50% of all member interests in the LLC. Id. at ¶4. Not quite a year after forming the LLC, Hot Spur Partners and Fabert entered into an employment agreement. Id. at ¶6. Eventually Beere hired an employee—Bruce Rowntree—away from one of his other business interests; Fabert and Rowntree did not get along. Id. at ¶¶8-10. Beere eventually fired Fabert. Id. at ¶11. Fabert sued Beere and Hot Spur, alleging that "Hot Spur Partners, through Beere, breached the terms of the Employment and Operating Agreements, and that Beere conspired with Rowntree to interfere with [Fabert's] business interests and employment contract." Id. at ¶17.

With regard to Fabert's tortious interference with contract claim, Beere argued that he could not, as a matter of law, tortiously interfere with his own contract. Id. at ¶37 (citing Wausau Medical Center). In rejecting this claim, the court of appeals explained:

> [Fabert] had two contracts: the Operating Agreement and the Employment Agreement, and [Fabert's] claim for unlawful interference with a business interest implicated both. His "business interest" not only was his minority ownership interest in Hot Spur

28

Partners, but also—as a result of that ownership—his employment with the company.

Beere's assertion that he cannot interfere with his own contract thus has no merit. Even if true as to his own rights under the Operating Agreement, it is to no avail as to [Fabert]. In *Wausau Medial Center*, the court held that the service corporation of Dr. Asplund, the medical center's former employee, could not tortiously interfere with the employment contract between Dr. Asplund and the medical center because Dr. Asplund and his service corporation in effect were the same person. *Wausau Med. Ctr.*, 182 Wis.2d at 297, 514 N.W.2d 34. Here, Beere used the Operating Agreement to interfere with the contract between [Fabert] and Hot Spur Partners. [Fabert], too, was a member of Hot Spur Partners, such that the company was not simply Beere's alter ego. This argument fails.

Id. at ¶¶38-39. Because Hot Spur Partners had at least one other member, Beere and Hot Spur were not one and the same, and Beere *could* interfere with the employment agreement.

The plaintiff attempts to distinguish the Rao/Wisconsin Medical Center/Olympia cases by asserting that the question is whether Melchior is an "alter ego" of Wypetech. Dkt. No. 93 at 93. It cites Schindler v. Marshfield Clinic, No. 05-C-705, 2007 WL 60924 (W.D. Wis. Jan. 4, 2007) and T.C. Dev. & Des. Inc. v. Disc. Ramps.com LLC, No. 07-C-0861, 2013 WL 11322642 (E.D. Wis. Oct. 16, 2013). But Schindler did not create some new test or deviate from Wausau Medical Center; Judge Crabb actually *applied* the holding in Wausau Medical Center but found the facts in Schindler distinguishable because the six individual defendants accused of tortious interference with contract—the chief medical officer, chair of the neurosurgery department, director of quality improvement and medical director for health information and management, chair of the neurology department, past chair of the neurosurgery department

29

and division medical director of defendant Marshfield Clinic—were *employees* of the defendant clinic; at best, they were agents of the clinic, not one and the same as the corporate entity that was the clinic. Schindler, 2007 WL 60924, at *17. And in T.C. Development, Judge Clevert found that allegations that the individual defendants "exercise[ed] control over" the defendant LLC were not sufficient to establish as a matter of law that these individuals were one and the same with the LLC. T.C. Development, 2013 WL 11322642, at *2.

The plaintiff also attempts to get around Melchior's sole ownership of Wypetech by arguing that "there were numerous decision makers at Wypetech beyond Melchior." Dkt. No. 93 at 21. The amended complaint alleges that Wypetech had "numerous employees and decision makers;" it asserts that although "Melchior owned 100% of its membership interests, Wypetech did not act solely through Melchior and had an existence separate from Melchior." Dkt. No. 52 at ¶131. The plaintiff may be right that there were other decision-makers at Wypetech besides Melchior, that others were responsible for certain day-to-day operations there (such as sales or new business development) and that others may have had authority to act on Wypetech's behalf in some circumstances, but those facts are not relevant in determining whether Melchior was the president, sole owner and sole shareholder of Wypetech, such that he and the LLC were functionally the same person.

The court will grant Melchior's motion to dismiss Count I because he could not tortiously interfere with his own right to contract.

b.     Melchior's Privilege to Cause Wypetech to Breach a Contract in Order to Maximize His Financial Interest in the Company

Melchior also argues that because he was Wypetech's sole owner, he was "conditionally privileged" to interfere with a contract to which Wypetech was a party. <u>Id.</u> at 14. This argument relates to the fifth element of a tortious interference claim—that the defendant was not justified or privileged to interfere with the contract. The court has concluded, however, that the plaintiff cannot prove the second element of a tortious interference claim: that Melchior interfered with a contract between the plaintiff and a *third party.* Because the plaintiff cannot prove the second element of a tortious interference claim, the court need not address whether it can prove the fifth element.

2.     *Count II: Tortious Interference with a Contract After Diversey's Purchase of Wypetech's Membership Interests*

Count II of the amended complaint alleges that Diversey and Melchior tortiously interfered with the Requirements Contract after Diversey purchased Wypetech. Dkt. No. 52 at 37. As to Melchior, there is a significant factual difference between Count I and Count II. As the court discussed above, prior to July 1, 2020 (the date Melchior sold Wypetech to Diversey), Melchior was not only president of Wypetech, but also the sole owner and shareholder. After the sale, Melchior remained the president of Wypetech, but no longer was an owner or a shareholder.

In his motion to dismiss, Melchior argues that the plaintiff cannot prove the fifth element of a tortious interference claim—that he was not justified or privileged to cause Wypetech to breach the Requirements Contract. Dkt. No. 71

31

at 17. To prevail on this argument, Melchior must demonstrate that after he sold Wypetech, he had some justification for causing Wypetech to breach the Requirements Contract or he was protected by some privilege. Melchior claims a privilege.

In <u>Lorenz v. Dreske</u>, 62 Wis. 2d 273, 287 (Wis. 1974), the Wisconsin Supreme Court quoted Ballantine on Corporations in stating that

> [i]f a director or managing officer acting bona fide procures, causes or participates in authorizing a breach of contract between his company and a third person, he may well be regarded as protected only by a conditional privilege, which will be destroyed by a wrongful motive. This conditional privilege of corporate representatives should be recognized in the interest of freedom in exercising discretion to protect the best interests of the corporation which they represent.

The Wisconsin Supreme Court reiterated this language in <u>Sprecher</u>. 78 Wis. 2d at 40. The Wisconsin Court of Appeals reiterated it in <u>Finch v. Southside Lincoln-Mercury, Inc.</u>, 274 Wis. 2d 719, 749 (Wis. Ct. App. 2004).

In <u>Mendelson v. Blatz Brewing Co.</u>, 9 Wis. 2d 487 (Wis. 1960), the Wisconsin Supreme Court discussed how to determine whether the privilege has been destroyed by wrongful motive. The court quoted a decision from the federal court from the District of Massachusetts, <u>Tye v. Finkelstein</u>, 160 F. Supp. 666 (D. Mass. 1958), in which that court stated,

> 'The plaintiff must establish that instead of acting 'within the privilege,' the defendant acted outside of it, that is to say, from 'an improper motive.' It might be to the company's advantage to break the contract. It is not enough to show that defendant knew, or intended, that plaintiff would be harmed thereby, or even that he was gratified by such a prospect. I hold that 'malice' will not suffice to destroy a privilege unless it is shown to have been the sole motive.'

<u>Mendelson</u>, 9 Wis. 2d at 492 (quoting <u>Tye</u>, 160 F. Supp. at 668).

The Seventh Circuit referenced the privilege in <u>Caulfield</u>. It noted that the district court had dismissed a tortious interference claim against a non-party to the contract "based on Wisconsin law holding that a corporate officer acting within the scope of her authority cannot, as a matter of law, interfere with the corporation's contracts." <u>Caulfield</u>, 155 F.3d at 890 (citing <u>Sprecher</u>). Concluding that the plaintiff had failed to point to any evidence in the record "from which a reasonable juror could have concluded that [the defendant] acted beyond the scope of his conditional privilege," the Seventh Circuit affirmed the district court's grant of summary judgment on the tortious interference claim. <u>Id.</u> In <u>W.H. Major & Sons, Inc. v. Krueger</u>, 124 Wis. 2d 284, 295-96 (Wis. Ct. App. 1985), the Wisconsin Court of Appeals upheld the trial court's finding in a theft-by-contractor case that there was no improper motive where the defendant corporate officer and shareholder paid the salaries of officers rather than the plaintiff subcontractor. The court held that from the corporate officer's testimony that officer salaries were not fixed and that the officers drew them as needed, the trial court "could conclude that drawing salaries in the face of outstanding debts, while unwise, was not caused by an improper motive outside the privileged activity of corporate officer discretion," because the officers' services were needed to operate the corporation. <u>Id.</u>

Melchior argues that the plaintiff has not proven an improper motive for his post-July 1, 2020 interference with the Requirements Contract. The plaintiff disagrees. Dkt. No. 93 at 23. The plaintiff concedes that "the general rule in Wisconsin is that corporate actors are protected only by a conditional

33

privilege when acting on behalf of an entity, which conditional privilege is destroyed when they act with an improper motive." Id. (citing Lorenz). It asserts, however, that the "improper motive" that strips corporate representatives of the conditional privilege "includes the individual pecuniary gain of the actor." Id. (citing Sprecher, 78 Wis. 2d at 38-42; Finch; Fabert). The plaintiff asserts that it has alleged in the amended complaint that Melchior caused Wypetech to breach the Requirements Contract because it was in his, not Wypetech's, best interest. Id. The plaintiff says that Caulfield is distinguishable because the plaintiff in Caulfield did not identify any improper motive. Id. at 24. It argues that Krueger is distinguishable because it was only after a bench trial that the court concluded there was no evidence of improper motive. Id.

In his reply, Melchior argues that the plaintiff itself asserts in the amended complaint that once Melchior sold his membership in Wypetech to Diversey, "Diversey, Wypetech's sole member, determined Melchior's duties as Wypetech's president . . . ." Dkt. No. 102 at 12. He asserts that "[f]rom that point on, Wypetech legally existed to benefit and further the interests of Diversey, its sole owner." Id. Melchior says that the plaintiff has alleged that Melchior complied with his "alleged duties" as Wypetech's president by interfering with Wypetech's performance of the Requirements Contract, and therefore that his actions were taken in good faith to protect the interests of his corporation and in the course of his official duty. Id. at 12-13 (citing Lorenz). Melchior argues that the plaintiff has cited no authority stating that a

34

corporate officer's eligibility to receive a bonus because of the company's performance is an improper motive. Id. at 13. He says that the cases the plaintiff cited all involved corporate officers who took for themselves a benefit to which the corporation was legally entitled. Id. at 13-14.

The amended complaint alleges the following:

146.  Diversey and Melchior acted with improper motive in causing Wypetech to breach its contract with [the plaintiff] and are using the breach to further their own individual pecuniary gain, while leaving Wypetech liable for breaching its contract with [the plaintiff]. It was in Melchior's personal financial interests to cause Wypetech to continue breaching the Requirements Contract, which was to the detriment of Wypetech.

147.  Melchior has a personal financial interest and motive to continue interfering with the Requirements Contract. Melchior is eligible to receive a significant financial bonus from Diversey in July 2021 if he remains employed and agrees to perform the duties and services Diversey requires from him. These duties and services include diverting supplies and production capacity away from [the plaintiff], thereby interfering with the Requirements Contract. In addition, Melchior is personally eligible to receive up to $2 million that has been placed in an escrow account. That amount is subject to reduction for indemnification claims made by Diversey. In June and July 2020, Melchior originally represented that the Requirements Contract was valid and enforceable. But since then, Diversey's attorneys have stood by while Melchior has adopted entirely opposition positions under oath. Melchior's opportunity to earn the entire escrow amount therefore may now depend on both the continued interference with the Requirements Contract to aid Diversey and to say whatever it takes for [the plaintiff's] claims to fail. The bonus and escrow amounts give Melchior a personal financial interest and motive to continue interfering with the Requirement's Contract, even though it is not in Wypetech's best interests.

Dkt. No. 52 at ¶¶146-47.

The plaintiff's insistence that Melchior's post-July 1, 2020 interference with the Requirements Contract is not in Wypetech's best interests appears to

35

stem from its belief that "[b]ecause demand for [the plaintiff's] and Diversey's products in the pandemic far exceeds what Wypetech and others can supply, by purchasing Wypetech and cutting off [the plaintiff's] orders, Diversey crippled [the plaintiff] and harmed Wypetech." Id. at ¶71. It asserts that "Wypetech would have been better off honoring its contract with [the plaintiff], rather than breaching the [contract with the plaintiff] for Melchior's benefit." Id. at ¶121.

On the one hand, the court agrees with Melchior that the allegations in the amended complaint do not sound like actions taken outside the privilege of corporate officer discretion. Once Diversey purchased Melchior's membership rights in Wypetech, it became his duty as president to do whatever he could to make the Diversey-owned version of Wypetech successful, with the definition of "successful" being up to Diversey. While the plaintiff believes that losing the plaintiff as a customer was financially harmful to the Diversey-owned Wypetech, Diversey does not appear to share that view, as demonstrated by the facts alleged in the amended complaint. The fact that Melchior could get a bonus if he performed as Diversey required does not appear to be the kind of personal pecuniary gain that, under the cases cited, constitutes "improper motive." And the plaintiff's claim that Melchior's ability to receive the amount in escrow may depend upon his doing something unethical or dishonest is speculation.

On the other hand, "The burden, of proving lack of privilege . . . is generally not ascribed to the plaintiff. Rather, proof of intentional interference

36

with the existing contractual relations of another is sufficient to establish liability shifting the burden of proving the justification for such interference upon the defendant." Chrysler Corp. v. Lakeshore Comm. Fin. Corp., 389 F. Supp. 1216, 1221 (E.D. Wis. 1975). See also, WIS JI-CIVIL 2780 INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP (2020) ("The burden of proof as to question five [whether (defendant) was justified (or privileged) to interfere with the contractual relationship (plaintiff) had with (3rd party)] is on (defendant). In questions one and five, the party contending that the question should be answered 'yes' must satisfy you, by the greater weight of the credible evidence, to a reasonable certainty, that 'yes' should be your answer."). For this reason, the Wisconsin Court of Appeals has concluded "that, to survive a motion to dismiss, it is not necessary for a plaintiff to allege facts sufficient to establish the *absence* of privilege or justification. Rather, it is enough to assert that the act or acts constituting intentional interference was, in fact, not privileged, which the [plaintiffs] have done." Finch, 274 Wis. 2d at 749.

This is what the plaintiff appeared to be getting at when it argued in its opposition brief that it was only after a bench trial that the court in Krueger concluded that there was no evidence of improper motive. In Sprecher, the Supreme Court reached its decision that Julia Weston had improper motive based on evidence adduced during a bench trial. Sprecher, 78 Wis. 2d at 33. The Seventh Circuit in Caulfield had the benefit of evidence produced at the summary judgment stage as well as evidence presented at trial on contract and *quantum meruit* claims. Caulfield, 155 F.3d at 885-86.

37

The plaintiff has alleged that Melchior's actions were not privileged. Although the court is skeptical that the plaintiff will be able to prove that Melchior had an improper motive, the plaintiff has alleged enough to survive dismissal under Finch. The court will deny the motion to dismiss Count II as to Melchior.

3.  *Counts Three and Four: Civil Conspiracy*

In Count III, the amended complaint alleges that both before and after Diversey purchased Melchior's membership interest in Wypetech, Melchior and Diversey conspired to violate Wis. Stat. §134.01. Dkt. No. 52 at ¶¶153-161. In Count IV, it alleges that both before and after Diversey purchased Melchior's membership interest in Wypetech, Melchior and Diversey engaged a common-law conspiracy to interfere with the Requirements Contract, to harm the plaintiff's business and reputation and to prevent Wypetech from performing the Requirements Contract, and that they did so to the plaintiff's detriment. Id. at ¶¶162-168.

a.  Count III: Wis. Stat. §134.01

Under Wis. Stat. §134.01,

> Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.[3]

---

[3] While §134.01 is a criminal statute, "Wisconsin courts have found an implied right of action for victims of such conspiracies." Virnich v. Vorwald, 664 F.3d at 212 (citing Radue v. Dill, 74 Wis. 2d 239 (1976)).

38

To state a claim under §134.01, the plaintiff must allege: "(1) the defendants acted together, (2) with a common purpose to injure the plaintiff's business, (3) with malice, and (4) the acts financially injured the plaintiff." Virnich v. Vorwald, 371 Wis. 2d 565, ¶18 (Table) (Wis. Ct. App. 2016).

Melchior argues that the plaintiff cannot prove the "with malice" element, asserting that the amended complaint alleges Melchior acted to further his business and financial interests and not for the purpose of harming the plaintiff. Dkt. No. 71 at 20. He asserts that the amended complaint is "replete" with allegations that Diversey and Melchior acted to further their financial interests or their pecuniary gain. Id. at 23. While conceding that the plaintiff alleges that he acted to harm the plaintiff, Melchior asserts that this unsupported allegation is "inadequate" given the plaintiff's other allegations that his main motivation was to further his own financial interests. Id.

The plaintiff responds that the law does not require it to allege that a defendant acted solely out of malice. Dkt. No. 93 at 24. Citing Maleki v. Fine-Lando Clinic Chartered, 162 Wis. 2d 73 (Wis. 1991), the plaintiff argues that it need only allege that Melchior was partly motivated by malice. Id. at 24-25. The plaintiff asserts that Melchior acted both to benefit himself and to harm the plaintiff, and that his intent to harm the plaintiff was irrational given the fact that the plaintiff was Wypetech's biggest customer. Id. at 25.

Melchior asserts that the plaintiff is "wrong," and that Section 134.01 "requires a singular malicious purpose, not a rational dual purpose." Dkt. No. 102 at 14. He characterizes the plaintiff's recitation of the case law as

39

"misleading," particularly the plaintiff's reliance on a single passage from Maleki. Id. at 15. Melchior cites cases in which courts have stated that the malice required by the statute cannot be based on the defendant's desire to gain a competitive advantage. Id. Finally, Melchior argues that the plaintiff has alleged no facts indicating that his actions were irrational. Id. at 16.

Section 134.01 requires that the defendants act "for the purpose of willfully or maliciously injuring another." "Malice is an 'integral element' of a conspiracy claim under WIS. STAT. §134.01, and 'must be proved in respect to [all] parties to the conspiracy." Virnich, 371 Wis. 2d 565 at ¶19 (quoting Maleki, 162 Wis. 2d at 86 (Wis. 1991) (other citations omitted)). The Wisconsin Supreme Court in Maleki explained that "[f]or conduct to be malicious under the conspiracy law it must be conduct intended to cause harm for harm's sake." Maleki, 162 Wis. 2d at 86. The Maleki court went on to discuss State ex rel. Durner v. Huegin, 110 Wis.189 (Wis. 1901) "and the associated case that went to the United States Supreme Court sub nomine, Aikens v. Wisconsin, 195 U.S. 194 . . . (1904)." Id.at 87. The Maleki court explained:

In Huegin, the Wisconsin Supreme Court said:

'Malice,' as here used, does not merely mean an intent to harm, but means an intent to do a wrongful harm and injury. An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another, it is malicious; and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition.

110 Wis. at 260 . . . .

On appeal to the United States Supreme Court, Justice Oliver Wendell Holmes, Jr., speaking for the Court, thus spoke of the element of malice in Wisconsin's conspiracy statute:

40

> We interpret "maliciously injuring" to import doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition].
>
> 195 U.S. at 203 . . . .

Id. at 88. The court concluded, "[i]t is apparent then that whatever other evidence is produced, an essential element of the cause of action is the malicious motive of the conspirators sought to be charged." Id.

Of note in cases where a plaintiff alleges a conspiracy involving business competitors, the Maleki court dropped this footnote: "The conspiracy cases are replete with statements pointing out that competition that incidentally harms another when the purpose is to improve one's competitive advantage does not run afoul of conspiracy laws if there is not a malicious motive." Id. at 87 n.9. This point has been determinative in more than one case where a business alleges that a competitor conspired in violation of §134.01.

In Western Wis. Water, Inc. v. Quality Beverages of Wis., Inc., 280 Wis. 2d 556 (Table) (Wis. Ct. App. 2005), the court of appeals concluded that the evidence showed only that the defendant "pursued their mutually advantageous transaction knowing both that [the plaintiff] claimed a superior right to acquire the . . . assets and that [the defendant competitor] would likely obtain a significant competitive advantage over [the plaintiff] in the LaCrosse bottled water market by acquiring those assets." Id. at ¶29. This was not enough to prove a malicious motive.

In Virnich v. Vorwald, the Seventh Circuit stated:

41

In short, an *irrational* desire to cause harm for the sake of harm is actionable under section 134.01. A *rational* desire to cause harm for the sake of competitive advantage is not. . . . So, for [the plaintiff's] claim to withstand a motion to dismiss, he must plead facts from which it could plausibly be inferred that both [defendants] irrationally wanted to harm him for harm's sake.

\* \* \* \* \*

The malice that must be pled to satisfy section 134.01, by definition, must not be based on the defendant's intent to gain a competitive advantage. To be actionable, the defendant's motive is not supposed to make sense. The plaintiff must allege and then prove an irrational desire to harm for harm's sake.

Virnich, 664 F.3d at 213-14. The Seventh Circuit concluded that the plaintiff's allegation that one defendant heard another defendant's description of the plaintiff as a "bad guy" and, for that reason, agreed to engage in the acts alleged, was sufficient to plead malice. Id. at 214.

In Raab v. Wendel, No. 16-CV-1396, 2019 WL 1060856, *24 (E.D. Wis. Mar. 6, 2019), the court considered the proof of malice at the summary judgment stage. In granting summary judgment on the §134.01 claim, the court stated:

The plaintiffs have failed to muster evidence from which a reasonable finder of fact could find that any two defendants intended to cause harm for harm's sake. The plaintiffs' reading of malice is far too narrow. An action done for the purpose of legitimate business competition is necessarily not done with malice; but that does not mean that any act done for a purpose other than legitimate business competition is malicious. . . . Perhaps the finder of fact could conclude that [two of the defendants] acted in their own self-interest and injured [the plaintiff] in the process. But malice requires more than merely intentional injury. *See Friemuth v. Fiskars Brands, Inc.*, 681 F. Supp. 2d 985, 992 (W.D. Wis. 2010) ("If anything, the allegations suggest that plaintiff and any co-conspirator performed in the allegedly injurious acts to make money (for their own sake), not to make defendant lose money ('for harm's sake').'"

42

Id.

In finding that the claim failed to state a claim under §134.01, the court

in Roumann Consulting, Inc. v. Symbiont Constr., Inc. explained:

> These facts establish that the defendants did not act maliciously,
> that is, with an irrational desire to cause harm for harm's sake. It is
> true that the complaint alleges generally that the defendants acted
> "maliciously," . . . and that, under federal pleading rules, malice may
> be alleged generally, see Fed. R. Civ. P. 9(b). But the plaintiffs then
> undermine their own allegation of malice by pleading that the
> defendants acted rationally in furtherance of [the defendant's]
> business interests by attempting to terminate a contractor that the
> firm deemed overcompensated and expendable while paying him as
> little post-termination compensation as possible and keeping the
> customer he had brought to the firm.

No. 18-C-1551, 2019 WL 3501527, at *10 (E.D. Wis. Aug. 1, 2019).

Like the complaint in Roumann, the amended complaint here alleges

repeatedly that Melchior and Diversey acted with malice, or with the intent to

harm the plaintiff. See, e.g., Dkt. No. 52 at ¶¶9, 65, 124, 128, 149, 156, 157.

But like the plaintiff in Roumann, the plaintiff asserts far more frequently that

Melchior acted to further his own financial interests. The amended complaint

concedes that in the summer of 2019, the plaintiff had been talking with

Wypetech about not renewing the Requirements Contract; while it insists that

it never gave written notice of non-renewal and that it told Wypetech it did not

want to terminate the relationship, the fact that the plaintiff was considering

not renewing at some point was "out there," so to speak. The amended

complaint discusses in detail that the pandemic increased demand for the

types of products that the plaintiff and Diversey provide, creating a larger

market for the products. The plaintiff has alleged that Diversey negotiated with

Melchior to purchase (presumably, for a significant sum) Melchior's membership interest in Wypetech and has explained that that purchase eventually occurred. It has alleged that Diversey—sole member of Wypetech, of which Melchior is president—is marketing to the plaintiff's own customers as well as supplying others. The plaintiff has alleged that Melchior "sought to further his own individual pecuniary gain" by inducing breach of the Requirements Contract and selling his membership interest to Diversey, dkt. no. 52 at ¶121, that he acted to "serve his own personal interests" and to further his own individual pecuniary gain," id. at ¶122, that he acted for his "own personal financial gain," id. at ¶129, that he had a "personal financial interest and motive to continue interfering with the Requirements Contract," id. at ¶147, and that he is eligible to receive a bonus and the $2 million in escrow id. at ¶147.

The plaintiff, as Melchior points out, pulls a single sentence from Maleki, in which the Wisconsin Supreme Court paraphrased a statement from a 1901 Wisconsin Supreme Court case, indicating that if a combination of persons act "even in part" as the result of malicious motive, "the injury to another is actionable." Dkt. No. 93 at 24-25 (citing Maleki, 162 Wis. 2d at 88). It cites Wis. Seafood Co., Inc. v. Fisher, 263 Wis. 2d 432, ¶30 (Table) (Wis. Ct. App. 2003), a case in which the plaintiff did not plead a violation of §134.01. It cites Centrifugal Acquisition Corp., Inc. v. Moon, 849 F. Supp. 2d 814, 828 (E.D. Wis. 2012), where the court perfunctorily addressed the §134.01 claim in a handful of sentences and concluded that there was evidence showing that the

defendant "intended to do wrongful harm" sufficient to create a genuine dispute as to whether the defendant acted with malice. Given the weight of other authority, these cases are not persuasive.[4]

As did the plaintiff in <u>Roumann</u>, the plaintiff her has argued itself out of court as to this claim against Melchior. Adding "intended to harm" and "maliciously" to claims that a defendant acted rationally for the sake of competition and that harm resulted is not sufficient to plead a claim under §134.01.

The court will grant Melchior's motion to dismiss Count III against him.

    b.    Count IV: Common Law Conspiracy

"Civil conspiracy involves 'a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not itself unlawful.'" <u>N. Highland, Inc. v. Jefferson Mach. & Tool, Inc.</u>, 377 Wis. 2d 496, 509 (Wis. 2017) (citing <u>City of Milwaukee v. NL Indus., Inc.</u>, 278 Wis. 2d 313 (Wis. Ct. App. 2005)). A common-law conspiracy claim has three elements: "(1) the formation and operation of a conspiracy; (2) a wrongful act or acts done pursuant to the conspiracy; and (3) damage resulting from the act or acts." <u>Id.</u> (citing <u>Onderdonk v. Lamb</u>, 79 Wis. 2d 241, 247 (1977)). "The facts alleged must

---

[4] The court agrees with the plaintiff that some of the cases Melchior cites— <u>Kuraki Am. Corp. v. Dynamic Int'l of Wis., Inc.</u>, Nos. 14-C-583, 14-C-628, 2014 WL 6834226, at *3 (E.D. Wis. Dec. 3, 2014); <u>Select Creations, Inc. v. Paliafito Am., Inc.</u>, 828 F. Supp. 1301, 1347 n.43 (E.D. Wis. 1992); <u>Pappas v. Cty. of Milwaukee</u>, 343 Wis. 2d 678, ¶¶25-29 (Wis. Ct. App. 2012) either do not address the malice question direction or are too fact-bound to be of assistance.

Case 2:20-cv-01579-PP    Filed 09/27/21    Page 45 of 81    Document 127

'show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." Kroeger v. Brautigam, 371 Wis. 2d 758, ¶25 (Table) (Wis. Ct. App. 2016) (quoting Augustine v. Anti-Defamation League of B'nai B'rith, 75 Wis. 2d 207, 216 (Wis. 1977)). Id. The "wrongful act" need not be unlawful in that it is criminal. The conduct needs only to "violate some recognized legal norm." Gene Frederickson Trucking and Excavating, Inc. v. Wagner, 387 Wis. 2d 685, ¶13 (Table) (Wis. Ct. App. 2019) (citing Modern Materials, Inc. v. Advanced Tooling Specialists, Inc., 206 Wis. 2d 435, 447 (Wis. Ct. App. 1996)). Common law conspiracy does not include a malice requirement.

Melchior makes one argument in opposition to the plaintiff's common-law conspiracy claim related to Melchior's conduct prior to his July 1, 2020 sale of his Wypetech membership rights to Diversey and a different argument regarding his conduct after the sale. Dkt. No. 71 at 23.

i. **Pre-acquisition**

Melchior first argues that the plaintiff failed to allege an agreement between Melchior and Diversey. Dkt. No. 71 at 26. He argues that the amended complaint alleges that before July 1, 2020, negotiations took place and due diligence occurred, but that the plaintiff itself alleges that "it was not until Diversey closed on the acquisition of the Wypetech interests that Diversey 'put into gear the plan to shift Wypetech's production capacity from Wypetech's former customers to Diversey." Id. (citing Dkt. No. 52 at ¶85). Melchior asserts that the amended complaint describes Diversey's interest in Wypetech's

46

contract with Kimberly-Clark, discusses the defendants speaking regularly about Wypetech's production capacity and describes the conduct of due diligence and the exchange of draft transaction documents, but he asserts that those are "allegations of routine pre-transaction conduct." Id.

The plaintiff responds that "the conspiracy began at or about the time Melchior and Diversey began their discussions regarding Diversey's purchase of Wypetech's membership interests." Dkt. No. 91 at 28 (citing dkt. no. 52 at ¶¶70-90, 156-159, 163-166). It asserts that "[t]he fact that Melchior and Diversey reached an agreement on the concerted actions and planned and coordinated the common end of harming [the plaintiff] and cutting of[f] its wipe supply, and that they acted together in cooperation pursuant to a common plan, is reasonably inferred from the facts recited in the Amended Complaint." Dkt. No. 91 at 28.

Melchior replies by reiterating that the allegations of pre-sale interactions were nothing but negotiations and due diligence and asserts that mere association between himself and Diversey does not necessarily establish a conspiracy. Dkt. No. 102 at 18. He describes the pre-sale allegations as a "run-up to a corporate transaction," not an agreement to violate the law. Id.

The allegations regarding the pre-sale interactions between the defendants begin at paragraph 70 of the amended complaint. The amended complaint alleges that "[months]" before the sale, Diversey "worked with Melchior to divert capacity towards producing wipes for Diversey" and that as early as April 2020, "Wypetech and Diversey discussed increasing Wypetech's

47

production of wipes for Diversey." Dkt. No. 52 at ¶72. It asserts that in late April and early May, "the conversation"—presumably between Wypetech and Diversey—"focused on the fact that Diversey wanted to acquire Wypetech so that Wypetech could manufacture the wipes that were currently outsourced to other manufacturers." Id. at ¶73. It asserts that on May 18, 2020, Melchior asked Diversey whether the plan would be for Wypetech to cancel its current purchase orders after the sale, to make room for Diversey orders. Id. The amended complaint asserts that on May 4, 2020, Diversey's vice-president of corporate development asked how long it would take Wypetech to switch from its current customer base to Diversey internal supply, anticipating that Wypetech might have long-term contracts. Id. at ¶74. It asserts that Melchior "immediately suggested that if the facility switched to just running Diversey's products, 'the efficiencies really start to pay off.'" Id. The pleading asserts that Diversey was "interested" in Wypetech's contract with Kimberly-Clark, alleging that "the parties wanted to know if Wypetech could maintain and expand the Kimberly Clark contract if Diversey acquired Wypetech." Id. at ¶76. It claims that before the closing, "Diversey and Wypetech personnel spoke regularly regarding Wypetech's production." Id. at ¶77.

The amended complaint says that on May 12, 2020, Melchior met with Diversey's CFO, and that the next day, Melchior "assured" the CFO that Wypetech could do what it took to make 120,000 cases per month; it asserts that on May 15, 2020, "once Melchior made it clear that Wypetech could provide a significant amount of wipes to Diversey, Diversey made its first

48

formal offer to Melchior to purchase his interest in Wypetech." Id. at ¶78. It claims that on May 18, 2020, Melchior and Diversey discussed the amount of substrate needed to meet Diversey's demands and how the amount of substrate Wypetech used for the plaintiff related to that. Id. at ¶79. It explains that Diversey conducted due diligence and exchanged draft documents with Melchior between mid-May and mid-June 2020, asserting that "Melchior was interested in exactly what types of wipes Diversey wanted Wypetech to manufacture." Id. at ¶80. It asserts that on June 17, 2020, Diversey "scheduled a call with Melchior to get his '*view on customers/timing and **how to get out of POs.***" Id. at ¶81 (emphasis in amended complaint).[5] It contends that Melchior then obtained more substrate from its suppliers, "set[ing] aside millions of square yards of fabric from Kimberly Clark's July 2020 deliveries for Diversey's wipes, fabric that could have (and should have) gone to producing [the plaintiff's] alcohol-based Micro-Kill+™ wipes." Id. at ¶82. The amended complaint says that before the deal closed, Melchior and Diversey talked about which customers Wypetech would terminate and which it would keep, as well as discussing putting retained customers on "fabric allocation" until the parties could figure out how the supply played out. Id. at ¶84.

The amended complaint sums up by asserting that these allegations demonstrate that Wypetech began to shift its production from the plaintiff to

---

[5] Although there are several attachments to the amended complaint, the amended complaint does not cite an attachment for each fact that is allegedly supported by such an attachment. It appears the plaintiff anticipated that the court, or opposing counsel, would comb through the attachments and find the source document and page for each allegation.

Diversey "at the exact time the negotiations between Diversey and Wypetech began to heat up." Id. at ¶88.

The parties spill ink debating whether the above allegations show an agreement. As the court has noted, Wisconsin law says that to prove a common-law conspiracy, the plaintiff must show "a combination of two or more persons by some concerted action . . . ." N. Highland, Inc. 377 Wis. 2d at 509. Arguably the allegations in the amended complaint show a combination of two or more persons—Melchior, Diversey's CFO, Diversey's VP of corporate development, unnamed individuals referenced only as "Diversey." Arguably the allegations show some concerted actions—these individuals and others talking with each other, exchanging information, exchanging documents, conducting due diligence. The more relevant question is what those two or more persons were seeking to accomplish by that concerted action.

The answer to that question is the basis of Melchior's second argument— that the amended complaint does not state facts demonstrating that he and the others with whom he interacted at Diversey accomplished, or were trying to accomplish, an unlawful purpose (or a lawful purpose by unlawful means). Dkt. No. 71 at 27. He asserts that the common-law conspiracy claim is nothing more than a re-packaging of the tortious interference claim. Id.

The plaintiff alleges that the "unlawful purpose" was that Melchior and Diversey were trying to interfere with the Requirements Contract, to harm the plaintiff's business and reputation and to prevent Wypetech from performing the Requirements Contract, and that they did so to the plaintiff's detriment.

50

Dkt. No. 52 at ¶¶162-168. The court has concluded that the plaintiff cannot state a claim for tortious interference with contract against Melchior for the pre-sale activity because Melchior could not tortiously interfere with his own ability to contact. It follows that neither could he conspire to tortiously interfere with his own ability to contract. In the context of the *statutory* conspiracy claim under §134.01, the court has found that the plaintiff has not sufficiently alleged that Melchior acted with malice. That begs the question of whether there is some other legally recognizable "harm" Melchior and Diversey could have conspired to cause the plaintiff. The only other possibility the court can think of is the tort of injury to business, but that tort is codified in Wis. Stat. §134.01, and the court has concluded that the plaintiff has not alleged sufficient facts to state a claim under that statute.

That leaves breach of contract. At least one court has held that breach of contract is a "wrongful act" for the purposes of a common-law civil conspiracy claim. See Wangard Partners, Inc. v. Graf, 294 Wis. 2d 507, 528 n.7 (Wis. Ct. App. 2006). But the plaintiff has not alleged a breach-of-contract claim against Melchior; it can't, because it had no contract with Melchior. The Requirements Contract originally was between Multi-Pack, LLC and the plaintiff; Multi-Pack then assigned its rights under the contract to Wypetech. Dkt. No. 52 at ¶30. Melchior could not conspire to breach a contract to which he was not a party.

The plaintiff has not stated a common-law conspiracy claim against Melchior for his pre-acquisition conduct.

51

ii. **Post-acquisition**

Melchior reiterates that once Diversey acquired Melchior's membership interest in Wypetech, Diversey became the sole owner of Wypetech and Melchior Wypetech's employee and agent, and it argues that a parent company cannot conspire with its subsidiary. Dkt. No. 71 at 23. He also argues that a corporation cannot conspire with its principals, agents or employees, "because acts of a corporate agent are the acts of that corporation." Id. at 24.

The plaintiff responds that there are "two glaring issues with this argument." Dkt. No. 93 at 26. First, it asserts that the alleged conspiracy between Melchior and Diversey started before the sale of Melchior's interest in Wypetech and argues that the sale cannot "cut off their liability for those actions." Id. at 26-27. Second, it argues that the "intracorporate conspiracy doctrine" does not apply because the plaintiff has alleged that Melchior, not Wypetech, conspired with Diversey. Id. at 27. It says that "even to the extent the conspiracy involved Melchior's conduct as President of Wypetech, the intracorporate conspiracy doctrine only applies when there is a complete unity of interests between the Defendants." Id. (citing Brew City, 297 Wis. 2d at ¶¶46-50). The plaintiff argues that "[a]lthough Diversey may now own 100% of Wypetech's membership interests, there is nothing to show that Diversey and Wypetech, or more importantly, Diversey and Melchior have a complete unity of interest." Id. It reiterates its assertion that Wypetech would have been better off complying with the Requirements Contract instead of diverting capacity to

52

Diversey and that Melchior "had an individual self-interest in causing Wypetech to act to its detriment and breach the Requirements Contract." Id.

Melchior's reply repeats the arguments from his principal brief, as well as responds to the plaintiff's argument that Melchior and Diversey did not have a "unity of interests." Dkt. No. 102 at 16-17.

The court has concluded that the plaintiff has not alleged sufficient facts to state a claim for conspiracy—statutory or common law—against Melchior for his pre-sale conduct, so the first "glaring issue" the plaintiff describes is not an issue. There is no liability to "cut off."

In Ford Motor Co. v. Lyons, 137 Wis. 2d 397 (Wis. Ct. App. 1987), the Wisconsin Court of Appeals considered an argument that a company and its wholly owned subsidiary could not conspire in violation of Wis. Stat. §134.01. Ford Motor Company and its wholly owned subsidiary, Ford Credit, cited Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) in support of their argument that the jury erred in finding that they conspired with each other to willfully injure the reputation, trade and business of Lyons and others. Id. at 426. The court of appeals recounted that in Copperweld, the United States Supreme Court "held that a parent corporation and its wholly owned subsidiary were unable to conspire within the meaning of §1 of the Sherman Act." Id. (citing 15 U.S.C. §1 (1982)). It explained that the Copperweld Court had noted "that the Sherman Act is premised on the distinction between concerted and independent action." Id. at 427. It said, "[i]n short, the Court recognized 'that the ultimate interests of the subsidiary and the parent are

53

identical, so the parent and the subsidiary must be viewed as a single economic unit." Id. (citation omitted).

The Lyons court then explained that Wisconsin's version of the Sherman Act was Wis. Stat. §133.03.[6] Id. at 429. It noted that "[b]ecause our interpretation of sec. 133.03 is controlled by federal court decisions under the Sherman Act . . . we conclude, pursuant to *Copperweld*, that in Wisconsin a parent corporation and its wholly owned subsidiary are unable to engage in a conspiracy under sec. 133.03." Id. (citation omitted). But Lyons had not brought a claim under §133.03; he had alleged conspiracy to commit a business injury under §134.01. Id. The court stated, "[t]he issue thus becomes whether the underlying goals served by sec.133.03 are also served, at least in part, by sec. 134.01 and are invoked in this case, thereby permitting application of the *Copperweld* rule." Id. In answering that question in the affirmative, the court explained:

> Section 134.01, Stats., is designed to protect individuals from a conspiracy intended to maliciously or willfully injure another's reputation, trade, business, or profession. We recognized in *Gerol v. Arena*, 127 Wis.2d 1, 10-11 . . . (Ct. App. 1985), that there is not always a connection between the two chapters. This language connotes that there are also areas where a connection does exist. We even opined in *Gerol* that a sec. 134.01 violation could occur which would result in reduced competition, the very evil addressed by ch. 133, Stats. *Id.* at 11 . . . . We noted that a ch. 133 action has

---

[6] Section 133.03 is titled "Unlawful contracts; conspiracies." It deems unlawful any contract or conspiracy in restraint of trade and imposes criminal penalties on anyone who contracts or conspires in restraint of trade, as well as anyone who monopolizes trade or commerce or conspires to do so. The statute provides as an alternative to its criminal penalties the authority for the Department of Justice or a district attorney's office to bring an action for civil forfeiture.

54

an economic basis and recognized that a sec. 134.01 action might or might not have such a premise. *Id.* at 10 . . . .

In this case, the conspiracy claims made by Lyons do have an economic basis because they allege that Ford and Ford Credit conspired to "tortiously interfere in the contracts and business of the defendants." The basis of this complaint is clearly economic and rests upon the policy of this state which seeks to assure free and open competition in the marketplace, unimpeded by the conspiracy of others.

Since the principles invoked by Lyons are embraced by the policies of both secs. 133.03 and 134.01, Stats., we conclude the *Copperweld* rule applies, rendering Ford and its wholly owned subsidiary, Ford Credit, incapable as a matter of law of conspiring as alleged in the complaint.

Id. at 429-30.

In 2001, the court of appeals characterized the above decision as Wisconsin's "bar to conspiracy claims between a corporate principal and its agents." Manitowoc Western Co., Inc. v. Montonen, 244 Wis. 2d 285 ¶25 (Table) (Wis. Ct. App. 2001). The court stated the holding more directly—and without linking it to Wis. Stat. §§133.03 or 134.01—in Lane v. Sharp Packaging Sys., Inc., 248 Wis. 2d 380, 391 (Wis. Ct. App. 2001), stating that in Lyons, "[w]e held that, as a matter of law, a corporation and its wholly owned subsidiary are incapable of engaging in a conspiracy."

The Wisconsin Supreme Court addressed the concept in Brew City, 297 Wis. 2d 606. Referring to the concept as the "intracorporate conspiracy doctrine," the Brew City court noted that the doctrine originated in Copperweld. Id. at 628. In reviewing the lower court's grant of the defendants' motion to dismiss, however, the court concluded that the defendants had not identified anything in the complaint "that demands the conclusion that the

55

defendants had the unity of interests required for the intracorporate conspiracy doctrine to apply." Id. The Brew City court explained that the Copperweld holding was based "on a unity of interests between a parent company and a wholly-owned subsidiary." Id. The court found that the facts alleged in the plaintiff's complaint did not suggest "the complete unity of interests among the defendants of the sort in *Copperweld* and *Ford Motor Co.*," and it found that "the array of entities against whom Brew City has alleged conspiracy goes far beyond the single physician and his alter ego in *Wausau Medical*." Id. at 631.

The court agrees with the plaintiff that the intracorporate conspiracy doctrine—at least, to the extent that doctrine says that a corporation cannot conspire with its wholly owned subsidiary—does not apply here. The plaintiff has alleged that *Melchior* conspired with Diversey, not that *Wypetech* conspired with Diversey. The fact that a corporation (Diversey) cannot conspire with its wholly owned subsidiary (Wypetech) is irrelevant to the question of whether Melchior conspired with Diversey.

Melchior also argues, however, that as president of Wypetech, Diversey's wholly owned subsidiary, he was its agent and officer, and therefore could not conspire with his own corporation. In a 1990 case involving 42 U.S.C. §1985—the federal statute that prohibits conspiring to violate someone's civil rights—the Seventh Circuit explained:

> When Congress drafted § 1985 it was understood that corporate employees acting to pursue the business of the firm could not be treated as conspirators. Courts looked past the individual acts to concentrate on the collective decision. E.g., *Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 636 . . . (1819). Long before

56

Congress enacted § 1985, Blackstone remarked that the corporation and its managers are "considered as one person in law". William Blackstone, 1 *Commentaries on the Laws of England* \*456 (1st Ed. 1765). Neither the text and structure nor the background of § 1985 imply a decision to discard this understanding, which remains the accepted wisdom. E.g., 10 *Fletcher Cyclopedia of the Law of Private Corporations* § 4884 (Lenore M. Zajdel ed. 1986). Intra-corporate dealings under § 1985 therefore should receive the same treatment as intra-corporate dealings under the Sherman Act, enacted 19 years later with similar inattention to such details. See *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 . . . (1984). *Copperweld* emphasizes that the antitrust laws aim at preserving independent economic decisions, which supposes cooperation inside economic entities—cooperation that cannot be called "conspiratorial" without defeating the foundation of competition. Similarly, § 1985 aims at preserving independent decisions by persons or business entities, free of the pressure that can be generated by conspiracies, and again intra-corporate discussions lie outside the statute's domain.

Travis v. Gary Cmty. Mental Health Center, Inc., 921 F.2d 108, 110 (7th Cir. 1990).

In 2014, Judge Lynn Adelman citid Travis for the proposition that "officers' acts are acts of the corporation, and a corporation cannot conspire with itself." Starsurgical Inc. v. Aperta, LLC, 40 F. Supp. 3d 1069, 1078 (E.D. Wis. 2014) (citing Travis, 921 F.2d at 110). Five years later, Judge Adelman again cited Travis when concluding that corporations and their managers could not conspire with each other in violation of Wis. Stat. §134.01. In Roumann, Judge Adelman held that "a business decision made by the managers of a company is not legally considered to be the product of a 'conspiracy.'" 2019 WL 3501527, at *10.

On the state-court side, in Manitowoc Western, the Wisconsin Court of Appeals held that California's "agent's immunity" doctrine was "conceptually in

accord with *Copperweld*," and stated that the doctrine held that "[A]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." 244 Wis. 2d at ¶25 (quoting Black v. Bank of Am. N.T. & S.A., 30 Cal.App.4th 1, 35 . . . (1994)).

The amended complaint alleges that Diversey wanted Wypetech to extricate itself from existing purchase orders and divert those resources to producing Diversey's products. See, *e.g.*, Dkt. No. 52 at ¶¶73-74, 81. The plaintiff has alleged that after the sale of his interest in Wypetech to Diversey, Melchior worked with Diversey to accomplish this. Id. at ¶166. The plaintiff's own allegations demonstrate that after the sale, Melchior was acting as an officer of Diversey's wholly owned subsidiary and as its agent, fulfilling its directives. Because he was acting as an agent of, and in the interest of Diversey, Melchior could not have conspired with Diversey.

The plaintiff has asserted that Melchior stood to personally benefit from helping Diversey succeed. This fact does not require the conclusion that Melchior was acting outside the scope of his employment with Diversey or that he was not acting as Diversey's agent. If it did, every corporate officer, employee or agent who acted competitively on behalf of his or her corporation in the hope of a raise or a bonus or an ownership stake in the company would be guilty of conspiracy. While Melchior may have stood to gain financially, the plaintiff alleges that that gain was the result of his actions on behalf of Diversey and in its interest.

The plaintiff also has argued that Melchior and Diversey did not have a complete unity of interests, asserting that it would have been better for Wypetech to have honored the Requirements Contract with the plaintiff than to breach that contract and divert its capacity to Diversey. As the court has said, it appears that Melchior (and necessarily Wypetech) and Diversey felt otherwise. The plaintiff's opinion that Wypetech would have been better off continuing to supply the plaintiff does not demonstrate that Melchior and Diversey did not have a unity of interests, assuming the law required them to have one.

The court will grant Melchior's motion to dismiss Count IV as to Melchior.

C.     Diversey's Motion to Dismiss (Dkt. No. 73)

     1.     *Count I: Tortious Interference with a Contract Before Diversey's Purchase of Wypetech's Membership Interests*

Diversey argues that the plaintiff has alleged nothing more than "run-of-the-mill expressions of interest, due diligence, and negotiations with Melchior leading to Diversey's purchase of the Wypetech membership interests." Dkt. No. 74 at 11. It asserts that the pre-sale activities the plaintiff described in the complaint "are precisely the kind of business dealings and economic activities that courts are—and should be—careful not to deter in a competitive marketplace." Id. at 11. Diversey argues that the plaintiff has not alleged that it "directed Wypetech to divert products away from other customers, threatened Wypetech into doing so, or otherwise induced or caused Wypetech to breach its contract with [the plaintiff] *before* the acquisition." Id. at 12. It asserts that

59

"[m]erely stating its interest in having Wypetech produce its wipes and asking about how much of Wypetech's output Diversey could receive after the acquisition is not tortious interference." Id.

Diversey also argues that under the Iqbal/Twombley pleading standard, it is not enough for the plaintiff to assert that Diversey and Melchior "improperly" used their influence to substitute their interests for those of Wypetech. Id. It argues that the plaintiff has not explained what influence Diversey allegedly exerted over Wypetech pre-acquisition. Id.

The plaintiff responds that even if competition is privileged under Wisconsin law, that privilege does not include encouraging breach of contract. Dkt. No. 91 at 15-16. It says that the cases on which Diversey relies to argue that it did not plead sufficient facts involved complaints that were conclusory, while the allegations in the plaintiff's amended complaint are detailed and specific. Id. at 16-18. The plaintiff asserts that the court can look at the amended complaint as a whole "to draw the reasonable inference that there is more than a sheer possibility Defendants are liable, or that the facts are sufficient to show there is a reasonable expectation discovery will reveal evidence supporting [the plaintiff's] allegations." Id. at 18.

In reply, Diversey points out that it has not asserted the competition privilege. Dkt. No. 104 at 11. Rather, it has argued that its pre-acquisition activities were nothing more than the kind of prudent exploration a would-be purchaser should conduct in a competitive market. Id. It ends by noting that it

60

is not enough for the plaintiff to state that it will flesh out its claims once the discovery process is complete. <u>Id.</u> at 12.

Diversey does not dispute that the plaintiff and Wypetech had a contract. It focuses its arguments on the second element of a tortious interference claim—whether it interfered with the plaintiff's contractual relationship with Wypetech.

The court begins with the parties' minor scuffle over "the competitor's privilege." Section 768 of the Restatement (First) of Torts provides that "[o]ne is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if . . . (b) the actor does not employ improper means." While Wisconsin courts have referenced this section of the Restatement, <u>see, e.g.</u>, <u>Pure Milk Products Co-op v. Nat. Farmers Org. (Pure Milk I)</u>, 64 Wis. 2d 241, 257 (Wis. 1974); <u>Pure Milk Products Co-op v. Nat. Farmers Org. (Pure Milk II)</u>, 90 Wis. 2d 781, 796-97 (Wis. 1979); <u>Liebe v. City Finance Co.</u>, 98 Wis. 2d 10, 16 n.8 (Wis. Ct. App. 1980), it is not clear to this court that Wisconsin has adopted such a privilege. <u>See</u> <u>Wolnak v. Cardiovasciular & Thoracic Surgeons of Cent. Wis.</u>, 287 Wis. 2d 560, 582 (Wis. Ct. App. 2005) ("Moreover, assuming without deciding that competition is, in fact, privileged, the privilege does not extend to encouraging the breach of an existing contract."). In its opening brief, Diversey quoted <u>Feldman v. Allegheny Int'l, Inc.</u>, 850 F.2d 1217, 1224 (7th Cir. 1988): "Legitimate competitive efforts, such as indicating interest in and making offers to acquire a company, are not tortious interferences with business." While Diversey correctly quoted the

61

Seventh Circuit, it lifted that quote out of context; in the immediately preceding sentence, the Seventh Circuit said that "complaints about the Moore group's competitive overtures winning it the Food Group companies are ended by the Illinois competitor's privilege," and cited several Illinois cases. Id. The court can see why the plaintiff was under the impression that Diversey was asserting some sort of competitor's privilege.

That said, Diversey has clarified that it did not intend to assert a (perhaps non-existent under Wisconsin law) competitor's privilege. Rather, Diversey argues that the things it did pre-acquisition—expressing an interest in buying Melchior's interest in Wypetech, asking Wypetech and Melchior about how they would switch manufacturing from other companies to Diversey if a sale were to occur and how long that would take, asking about which clients Wypetech would retain and which it would terminate, speaking regularly with Melchior and other Wypetech staff, asking about Wypetech's contract with Kimberly-Clark, exchanging documents with Melchior and conducting due diligence—were the kinds of things that any interested buyer would do when considering whether to purchase an asset. In its reply brief, Diversey asserts that if these activities constitute tortious interference with contract, "the effect would be a significant and improper expansion of potential tort liability in connection with standard corporate transactions." Dkt. No. 104 at 11.

The court agrees. Over forty years ago, the Wisconsin Court of Appeals cited the Restatement (Second) of Torts sec. 766 at 7 (1979): "One who intentionally and improperly interferes with the performance of a contract . . .

62

between another and a third person by *inducing or otherwise causing* the third person not to perform the contract, is subject to liability for the other . . . ." Charolais Breeding Ranches, 90 Wis. 2d at 105 (emphasis added). The elements of the cause of action require the plaintiff to allege that the defendant *intentionally interfered* with the contractual relationship. If a potential buyer's expressions of interest, purchase negotiations, questions about the impact of its target acquisition's current contractual obligations and practical preparations for acquiring a willing target constitute tortious interference with contract, it would be difficult, if not impossible, to engage in an intelligent and informed purchase of an active business. The plaintiff must allege that the defendant did something more than express interest in the target, enquire of the target, conduct its due diligence of the target and prepare to implement the target's capabilities.

The closest the plaintiff comes to alleging that "something more" are a handful of vague allegations. For example, the plaintiff alleges that "[o]n information and belief, following its offer to acquire Wypetech's membership interests, Diversey and Melchior forced Wypetech to prefer Diversey's orders to [the plaintiff's]." Dkt. No. 52 at ¶70. The plaintiff does not state how Diversey "forced" Wypetech to do this, particularly given, as the court has concluded, that Melchior and Wypetech were one and the same at that point. The plaintiff alleges that months before the purchase, Diversey "inserted itself into Wypetech's production planning and worked with Melchior to divert capacity towards producing wipes for Diversey." Id. at ¶72. While the words "inserted

63

itself" imply that Diversey was uninvited and unwanted, the plaintiff has alleged no facts to support that implication, again alleging that Diversey worked *with* Melchior. The plaintiff alleges that on June 17, 2020, Diversey "scheduled a call with Melchior to get his "*view on customers/timing and **how to get out of [purchase orders]*."" Id. at ¶81 (emphasis in amended complaint). Again, an interested buyer asking how the target will exit or terminate existing contractual obligations is not intentional interference with those obligations. The plaintiff asserts that "Diversey effectively controlled Wypetech's critical operations even before the purchase closed." Id. at ¶83. But the plaintiff's own descriptions do not support its use of the word "controlled."

The plaintiff argues in its opposition brief that the activities described in the amended complaint "went well beyond typical due diligence and inquiries about production." Dkt. No. 91 at 18. It does not explain how. "While a complaint attached by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . ." Twombly, 550 U.S. at 545. Stating, in conclusory fashion, that Diversey "forced" Wypetech to act, or "inserted itself" into the contractual relationship, without some allegations to support those characterizations is not enough, especially when the plaintiff's own description of events contradicts the characterizations.

The plaintiff has not alleged sufficient facts to allow it to proceed on a tortious interference with contract claim against Diversey based on its pre-

acquisition conduct. The court will grant Diversey's motion to dismiss Count I as to Diversey.

> 2. *Count II: Tortious Interference with a Contract After Diversey's Purchase of Wypetech's Membership Interests*

As to its post-acquisition conduct, Diversey argues that it was privileged to interfere with the Requirements Contract. Dkt. No. 74 at 13. Diversey asserts that since it acquired Melchior's membership interests and became Wypetech's sole member, it "ha[d] a financial interest in Wypetech sufficient to create a privilege to interfere in Wypetech's dealings, including its performance under existing contracts." Dkt. No. 74 at 14. It asserts that to state a claim for tortious interference based on post-acquisition conduct, the plaintiff must allege that Diversey utilized wrongful means. Id. Diversey asserts that the amended complaint shows that it did not use improper or unlawful means to induce Wypetech to breach the Requirements Contract. Id. It says that, at best, the complaint alleges that "Diversey used its wholly owned subsidiary, Wypetech, to benefit Diversey's business by having Wypetech supply more product to Diversey and other customers than to Diversey's competitor, [the plaintiff]." Id. at 14-15 (citing Dkt. No. 52 at ¶¶53, 55, 64-65, 69). Diversey argues that

> [t]hat conduct is at the core of what the financial interest privilege protects. It involves no physical violence, violation of business ethics, abuse of the corporate form, or conduct that violates statute or public policy. Diversey is simply alleged to have sought to maximize the benefit from its wholly owned subsidiary. That conduct is privileged as a matter of law.

Id. at 15.

The plaintiff responds that "the financial-interest privilege is irrelevant because it only applies to tortious interference claims regarding *prospective* contracts, not to conduct that interferes with a current contract." Dkt. No. 91 at 7 (citing Restatement (Second) of Torts §769 and its comment b). The plaintiff says in a footnote, however, that it recognizes "that this argument has been rejected by other Eastern District decisions and makes it in part to avoid any dispute about whether [the plaintiff] waived this argument if this case proceeds to the Seventh Circuit." Id. at 8 n.1.

The plaintiff next argues that the financial interest privilege is an affirmative defense which needs not be pled in the complaint. Id. at 8. It asserts that the court can grant a motion to dismiss based on an affirmative defense only if the plaintiff itself pleads facts that demonstrate an "impenetrable defense" to its claims (citing Tamayo v. Blagojevich, 526 F.2d 1074, 1086 (7th Cir. 2008)) Id. at 9.

The plaintiff argues that the question of whether the defendants were acting to protect their financial interest in Wypetech is a question of fact which is not a proper basis for granting a motion to dismiss. Id. at 10. In the next breath, it argues that the defendants are wrong in claiming that the amended complaint demonstrates an impenetrable defense to the plaintiff's claim. Id. It argues, for example, that its admission that the defendants had financial interests in Wypetech does not trigger the privilege; the defendants must show that they acted to protect those financial interests. Id. at 10-11. The plaintiff says that the defendants bear the burden of showing this and that it has not

66

been established. Id. at 11. It also argues that it need not prove that the defendants acted through improper means. Id. at 12. The plaintiff maintains that the defendants did not interfere with the Requirements Contract for the purpose of benefitting or protecting Wypetech, because the plaintiff was "by far Wypetech's biggest customer, and Diversey and Melchior caused Wypetech to breach the Requirement's contract for their own individual pecuniary gain, not to benefit Wypetech." Id. at 15.

Diversey replies that the Seventh Circuit has held that the financial interest privilege applies to claims of tortious interference with existing contracts. Dkt. No. 104 at 7 (citing Allen & O'Hara, Inc. v. Barrett Wrecking, Inc., 898 F.2d 512, 516 (7th Cir. 1990)). It argues that the plaintiff has pled itself out of court by pleading that Diversey acquired 100% of Wypetech's membership interests and used what then had become its wholly-owned subsidiary to benefit its business. Id. It asserts that it was entitled to operate Wypetech for its own financial gain, which is what the plaintiff alleges that it did. Id. at 10.

In Allen & O'Hara, the Seventh Circuit, sitting in diversity, considered a contract between Allen & O'Hara and Barrett Wrecking "for the demolition of a building owned by Northwestern Mutual Life." 898 F.2d at 514. Barrett encountered unanticipated conditions that caused delays in the contracted-for start and finish dates for the demolition. Id. Eventually, as the completion date got pushed back further and further, the president of NML "expressed his concern over the delays to A&O, and on May 9, 1980, A&O terminated the

67

contract." Id. at 515. A&O sued Barrett; NML intervened as a potential

indemnitor of A&O, and Barrett counterclaimed against NML for tortious

interference with contract. Id. After a jury trial, the district court granted

judgment notwithstanding the verdict on the tortious interference claim,

"finding that NML was privileged to interfere with the contract and therefore the

claim failed as a matter of law." Id.

In reviewing Barrett's argument that the court erred in granting

judgment notwithstanding the verdict on the tortious interference claim, the

Seventh Circuit explained:

> Wisconsin recognizes a cause of action against one who, without
> privilege to do so, induces a third person not to perform a contract
> with another. *Harman v. LaCrosse Tribune*, 117 Wis.2d 448 . . . (Ct.
> App. 1984). The Wisconsin courts have adopted the Restatement
> (Second) of Torts on tortious interference with contracts. *Liebe v.
> City Finance Company*, 98 Wis.2d 10, 15-16 . . . (Ct. App. 1980);
> Restatement (Second) of Torts §§ 766, 767 (1979). Section 769 of the
> Restatement discusses the situation where the actor has a financial
> interest in the business of the person induced. This section states
> that there is no tortious interference when one who has a financial
> interest in the business of a third party causes that person not to
> enter into a contract so long as wrongful means are not employed
> and the actor is protecting his interest in the relationship with the
> third party. *Id.* § 769.
>
> We believe that section 769 governs here. Comment c of that section
> states that a part owner of a business has a financial interest in the
> business. Therefore, NML had a financial interest in A & O.
> Moreover, comment e states that if the action is directed toward
> protecting the actor's interest, it is immaterial that he also takes a
> "malicious delight" in the harm caused by his action. While Barrett
> argues that NML had a malicious purpose, it is clear that NML also
> acted to protect what it felt was its interest in the demolition. Finally,
> there is no evidence that NML used wrongful means. In *Pure Milk
> Products Coop v. National Farmers Organization*, 64 Wis.2d 241 . . .
> (1974), the Wisconsin Supreme Court listed coercion by physical
> force or fraudulent misrepresentation as examples of improper

68

means. There is no evidence that any means resembling physical force or misrepresentation were used by NML. Consequently, Barrett's claim of tortious interference fails as a matter of law.

Allen & O'Hara, Inc., 898 F.2d at 516-17.

Ten years later, Judge Reynolds confronted the argument that the financial interest privilege did not apply to existing contracts. Closely reading Allen & O'Hara he disagreed. In Celite S.A. Industria e Comercio v. Sterling Plumbing Grp., Inc., 80 F. Supp. 2d 1009, 1011 (E.D. Wis. 2000), Judge Reynolds quickly dispatched the argument:

Celite's attempts to negate and distinguish *Allen* are unsuccessful. First, Celite argues that the financial interest privilege does not apply because of the pre-existing Agreement between Celite and Sterling, since section 769 applies only to *prospective* contractual relations. However, *Allen* applied section 769 to a situation involving a preexisting contract.

In 2010, Judge Stadtmueller came to the same conclusion when faced with an argument that Allen & O'Hara was not binding precedent. In Assembly Component Sys., Inc. v. Platinum Equity, LLC, No. 09-CV-778, 2010 WL 2719978, at *7 (E.D. Wis. July 7, 2010), Judge Stadtmueller concluded that it was and confirmed that the financial interest privilege applied to existing contracts.

The financial-interest privilege is set forth in the *Restatement (Second) of Torts*, § 769, and states:

One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he

(a) does not employ wrongful means and

69

(b) acts to protect his interest from being prejudiced by the relation.

*Id.* As an initial matter, it should be noted that ACS disputes whether the financial-interest privilege claimed by Platinum is even applicable in the instant case. Section 769, by its very terms, only purports to apply to instances of tortious interference with "prospective contractual relations," rather than with existing contractual relations. The instant case pertains exclusively to interference with existing contractual relations. However, while the language of § 769 would indicate that the financial-interest privilege is not applicable to tortious interference with an existing contract, Seventh Circuit cases law establishes that the financial-interest privilege is a legitimate defense to a claim of tortious interference with an existing contractual relationship. In *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990), a Wisconsin case, the Seventh Circuit applied § 769's financial-interest privilege to a claim of tortious interference with an existing contract. Because the Seventh Circuit offered no explanation for why it was extending § 769 beyond its terms, ACS argues that *Allen* is not binding, and this court is free to hold that financial-interest privilege is not a defense to a claim of tortious interference with an existing contract. ACS is mistaken. Such a ruling would require an express refutation of *Allen*, and is thus beyond the powers of this court. The fact that the Seventh Circuit did not explain why it was applying § 769 to an existing contract does not mean that this court is not bound by the precedent the Seventh Circuit created in doing so. Accordingly, the financial-interest privilege is a valid defense to a claim of tortious interference with an existing contract.

This district court, like Judges Reynolds and Stadtmueller, is bound by the Seventh Circuit's decision in <u>Allen & O'Hara</u> The plaintiff appears to have anticipated as much and has asserted that it argued that the financial interest privilege does not apply to existing contracts only to avoid waiving the argument should the case reach the Seventh Circuit. The Seventh Circuit is the proper court before which to make the argument.

Next, the plaintiff argues that the financial interest privilege is an affirmative defense for which Diversey bears the burden of proof and that the

70

plaintiff was "not required to plead around affirmative defenses in its Amended Complaint." Dkt. No. 91 at 8. As the court has discussed, the plaintiff is correct that "as a general rule of pleading, plaintiffs are not required to anticipate defenses which defendants may raise and thus are not required to negative potential defense in their complaint." Robinson by Robinsin v. Mount Sinai Med. Ctr., 137 Wis. 2d 1, 16 (Wis. 1987). See also, Indep. Trust Corp. v. Stewart Info. Serv's. Corp., 665 F.3d 930, 935 (7th Cir. 2012) ("A statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses.")

But if "a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate." Indep. Trust, 665 F.3d at 935. "[A] party may plead itself out of court by pleading facts that establish an impenetrable defense to its claims," Tamayo, 526 F.3d at 1086. "A plaintiff 'pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits.'" Id. (quoting Kolupa v. Roselle Park Dist., 438 F.3d 713, 715 (7th Cir. 2006)). "If the plaintiff voluntarily provides unnecessary facts in [its] complaint, the defendant may use those facts to demonstrate that [it] is not entitled to relief." Id. (citations omitted).

To determine whether the plaintiff has "pled itself out of court" regarding the financial interest privilege, the court must examine what the defendant must establish to assert that it is entitled to the privilege. Section 769 says that if the defendant has "a financial interest in the business of a third person," it

71

may interfere with a contractual relationship so long as the defendant "does not employ wrongful means" and "acts to protect his interest from being prejudiced by the relation."

The "acts to protect his interest from being prejudiced by the relation" prong was prominent in <u>Allen & O'Hara</u>. The Seventh Circuit found that when the president of NML expressed to A&O his concerns about the delays, it was "clear" that NML was acting to protect "what it felt was its interest in the demolition," regardless of whether it also had a malicious purpose. <u>Allen & O'Hara</u> 898 F.2d at 516.

Judge Stadtmueller also discussed this prong in <u>Assembly Component Sys.</u>, in which plaintiff ACS claimed that the defendant Platinum had tortiously interfered with a contract between ACS—a "company that manage[d] inventory of customer-specific parts to be used in its customers' manufacturing operations"—and Tecumseh, a "company that [sold] small engines." 2010 WL 2719978, at *1. ACS and Tecumseh had an inventory management agreement, under which ACS would provide services to three of Tecumseh's facilities, including a facility in Tennessee. <u>Id.</u> The agreement obligated ACS to "'order[] and maintain[] inventory of product for [Tecumseh].'" <u>Id.</u> When Platinum acquired Tecumseh and Tecumseh then closed the Tennessee facility, ACS informed Tecumseh that it had $1.72 million in inventory in a warehouse that ACS had leased and stocked to service the Tennessee facility, and insisted that Tecumseh purchase that inventory. <u>Id.</u> Once the Tennessee facility closed, ACS invoiced Tecumseh for the inventory remaining in the warehouse—over $1.5

million. Id. Tecumseh disputed that it was obligated to pay for the warehoused inventory. Id. ACS sued Platinum for tortious interference with the contract between ACS and Tecumseh. Id. at *6. Judge Stadtmueller concluded that Platinum had a financial interest in Tecumseh and that "if Platinum did act to cause Tecumseh not to buy unused inventory from ACS, then it did so to protect its own financial interest in Tecumseh." Id. at *8. In other words, Platinum would have been protecting its financial interest by preventing its new subsidiary from paying over $1.5 million for products it did not purchase.

In its brief in support of the motion to dismiss, Diversey focused solely on the "does not employ lawful means" prong of the financial interest affirmative defense, arguing that the amended complaint shows that Diversey did not use improper or unlawful means to induce Wypetech to breach the Requirements Contract. Dkt. No. 74 at 8-10. It did not address the "acts to protect its interests from being prejudiced by the relation" prong. In its reply brief, it asserted that "Diversey sought to maximize its benefit from, and protect its investment in, Wypetech by having Wypetech supply more product to Diversey and customers other than [the plaintiff], which is Diversey's competitor." Dkt. No. 104 at 1.

Even if the amended complaint alleged that Diversey sought to maximize its benefit from, and protect its investment in, Wypetech—and at best, the amended complaint only implies as much—that is not the kind of protecting of one's interests from prejudice the financial interest privilege contemplates. The language of Restatement (Second) of Torts, §769, cmt e, states that "[i]f the

73

actor does not believe that his interest will be *endangered* by the relation that he seeks to prevent, his purpose in seeking to prevent it is not the protection of that interest." Restatement (Second) of Torts, §769, cmt e (emphasis added). The amended complaint contains no facts indicating that once Diversey acquired Wypetech, it faced any actual or potential threat to its business, or to Wypetech's. The amended complaint contains no facts identifying any business interests of Diversey or Wypetech that were at risk or endangered after the purchase. To paraphrase crudely and broadly, the amended complaint alleges that Diversey acted to increase its market share and entice the plaintiff's customer base away. That is not protecting one's interests from a looming prejudice or danger. It is corporate empire-building. While there is nothing inherently unlawful in corporate empire-building, it does not constitute acting to protect an endangered business interest.

The plaintiff has not "pled itself out of court" on the financial interest privilege defense, because the amended complaint does not contain necessary facts which establish that defense to an "impenetrable" degree. Though the parties have spent pages disputing whether the amended complaint alleges facts that show that Diversey employed unlawful means to induce Wypetech to breach, the court need not wade into that fray. Because the financial interest privilege is an affirmative defense that the plaintiff is not required to plead around, and because the amended complaint does not contain facts showing that Diversey induced the breach as an act of protecting its interests from

74

being prejudiced by the Requirements Contract, the court will deny Diversey's motion to dismiss Count II as to Diversey.

### 3. Count III: Injury to Business under Wis. Stat. §134.01

The plaintiff's allegation that Diversey conspired with Melchior in violation of Wis. Stat. §134.01 fails to state a claim for the same reason that its allegation against Melchior failed to state a claim. The court will grant Diversey's motion to dismiss Count III.

### 4. Count IV: Common Law Conspiracy

The plaintiff's claim against Diversey for common law conspiracy fails for the same reason as its claim against Melchior. Diversey and Melchior could not have conspired. The court will grant Diversey's motion to dismiss Count IV.

## V. Defendants' Motions to Strike Plaintiff's Request for Attorneys' Fees (Dkt. Nos. 70, 73)

Paragraphs 107 through 112 of the amended complaint seek attorneys' fees for the litigation in the Northern District of Illinois. Dkt. No. 52 at ¶¶107-112. The plaintiff alleges that in July of 2020 it was "forced" to file suit against Wypetech and Diversey in the Northern District of Illinois, "to protect its interests." Id. at ¶110. It asserted that it had "been forced to incur tens of thousands of dollars of legal fees to protect its interests as a result of the actions by Diversey and Melchior." Id. at ¶112. It alleged that Diversey has "repeatedly asserted" that it is not a party to the Requirements Contract. Id. at ¶111. The amended complaint cites the Weinhagen rule, derived from Weinhagen v. Hayes, 190 N.W. 1002 (Wis. 1922). Id. at ¶¶107-109.

75

In his motion to dismiss, Melchior asked that in the alternative to dismissing the claims against him, the court dismiss with prejudice or strike under Fed. R. Civ. P. 12(f) the allegations relating to, and claims for, attorneys' fees. Dkt. No. 70. Melchior argues that the Weinhagen exception to the American Rule on recovery does not apply because there are no allegations that Melchior's conduct was wrongful, much less wrongful enough to trigger the exception. Dkt. No. 71 at 30. Melchior also asserts that the plaintiff is the *plaintiff* in the Northern District of Illinois case, and thus cannot argue that it was "forced" into litigation that it brought of its own accord. Id. Diversey also asked for the court to dismiss the attorneys' fees claims as alternative relief. Dkt. No. 73. Its arguments are identical to Melchior's. Dkt. No. 74 at 24-26.

The plaintiff responds that it has alleged intentional torts against the defendants, sufficient to trigger the Weinhagen exception. Dkt. No. 93 at 30. It argues that the defendants have cited no Wisconsin authority for the proposition that a plaintiff cannot invoke the Weinhagen exception because it is a plaintiff in the Illinois case. Id. It insists that it has been "required to expend the fees and costs to protect its interest as a result of wrongful conduct by Diversey and Melchior." Id. at 31.

The United States Supreme Court has held that "[o]ur basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." Baker Botts LLP v. ASARCO, LLC, 576 U.S. 121, 126 (2015) (quoting Hardt v. Reliance Standard

76

Life Ins. Co., 560 U.S. 242, 252-253 (2010)). In 1922, however, the Wisconsin

Supreme Court decided Weinhagen v. Hayes. The issue in Weinhagen was

"whether or not the appellants are entitled to recover upon the account the

amount of the liabilities incurred by them for attorneys' fees in defending the

action begun by the plaintiff and in asserting the cause of action set out in

their counterclaim, which resulted in a judgment canceling and rescinding the

contract upon which the plaintiff sued, for the reason that it was tainted by

fraud." Weinhagen, 190 N.W. 1002, 1002-03. The court recounted that "[i]n all

actions begun and prosecuted for the cancellation and rescission of a contract,

upon the ground of fraud, it is one of the conditions of relief that the parties be

placed in statu quo," and the appealing defendants argued that in such cases

"recovery of attorney fees is allowed." Id. at 1003. They cited several cases in

support of their argument.

    The Wisconsin Supreme Court explained:

> An analysis of these cases discloses the fact that they are mainly of
> two classes: First, those in which punitory or exemplary damages
> may be allowed and in which class of case some courts, particularly
> those of Connecticut, hold that a jury may take into consideration
> plaintiff's expenses in the suit; or, second, those in which the
> complaining party has been, through the fraud of the opposite party,
> involved in litigation and in the prosecution thereof has incurred
> liability for attorneys' fees in actions other than the one in which
> recovery is sought. The correct rule is stated in McGaw v. Acker,
> Merrall & Condit Co., 111 Md. 153, 73 Atl. 731, 134 Am. St. Rep.
> 592:
>
>> "The general rule is that costs and expenses of litigation, other
>> than the usual and ordinary court costs, are not recoverable in
>> an action for damages, nor are such costs even recoverable in
>> a subsequent action; but where the wrongful acts of the
>> defendant has involved the plaintiff in litigation with others, or
>> placed him in such relation with others as to make it necessary

77

to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act."

Id.

In 1991, while still a bankruptcy judge, Judge Charles N. Clevert, Jr. characterized the Weinhagen exception as applying "where fraudulent conduct by the defendant causes the plaintiff to become involved in litigation with another to protect his interest." Matter of Milwaukee Cheese Co., Inc., 128 B.R. 538, 543 (Bankr. E.D. Wis. 1991). The Wisconsin Court of Appeals described it as "an exception to the American rule barring the award of reasonable attorney fees where wrongful acts of a defendant place a plaintiff in such a relation with a third party as to make it necessary to incur expenses to protect the plaintiff's interests." Schlomer by Bye v. Perina, 173 Wis. 2d 889, 904 (Wis. Ct. App. 1991). To recover under this rule, "(1) the party from whom fees are sought must have committed a wrongful act against the party seeking attorney fees; and (2) the commission of such wrongful act forced the party seeking fees into litigation with a third party, or required the party seeking attorney fees to incur expenses protecting that party's interests against claims arising from the wrongful act." Estate of Kriefall v. Sizzler USA Franchise, Inc., 342 Wis. 2d 29, 70 (Wis. 2012). The "wrongful act requirement demands more than an allegation of mere negligence that has involved a party in litigation; instead, 'wrongfulness' requires something similar to fraud or breach of a fiduciary duty to the party seeking attorney fees." Id. at 71.

78

In Marquardt v. Milwaukee Cty, 249 Wis. 2d 780, 791-92 (Wis. Ct. App. 2001), the Wisconsin Court of Appeals found that the Weinhagen exception allowed recovery of attorneys' fees from a "wrongdoer only if they were incurred by a party who was forced to litigate with a third party." The court declined to apply the exception in a case where the plaintiff asserted that because the defendant had acted "wrongfully," he was forced into the suit. Id. at 792. The court also concluded that the defendants' actions had not forced the plaintiff into a suit with a third party—the plaintiff had litigated directly against the defendants from whom he sought fees. Id.

In Bank One v. Koch, the Wisconsin Court of Appeals described an example of a "classic third-party litigation case." 256 Wis. 2d 618, 626 n.4 (Wis. Ct. App. 2002). The court explained:

> In contrast, *Independence Leasing Corp. v. Acquino*, 133 Misc.2d 564, 506 N.Y.S.2d 1003 (N.Y.Co.Ct. 1986), is a classic third-party litigation case. In that case, a son forged his father's name on automobile leasing documents notarized by a bank employee. *Id.* at 1004. After the son failed to make payments on the lease, the leasing company sued the father for breach of contract. *Id.* at 1004 n. 1. The father successfully defended on the merits. *Id.* The leasing company then joined the bank and the notary as defendants alleging negligence and misconduct of a notary. *Id.* The father cross-claimed against the bank for attorney fees. The court held that the father was entitled to recover attorney fees under a theory of implied indemnity arising out of his having to defend his interest in the leasing company's action which was occasioned by the notary's grossly negligent actions in notarizing the lease documents. *Id.* at 1008.

The plaintiff alleges that the defendants in *this* case—Melchior and Diversey—"forced" him to sue Wypetech and Diversey in the Northern District of Illinois. The plaintiff cannot invoke the Weinhagen exception against

79

Diversey to argue that Diversey forced him into litigation with Diversey. The plaintiff sued Diversey directly in the Northern District; Diversey was not a "third party" in that litigation. Nor can he invoke the <u>Weinhagen</u> exception to recover attorney's fees from Diversey for his suit against Wypetech; when he sued Wypetech, Wypetech was a wholly owned subsidiary of Diversey—again, not a third party. Finally, he cannot invoke the <u>Weinhagen</u> exception to recover attorney's fees from Melchior for his suit against Diversey and Wypetech; when he sued Diversey and Wypetech, Melchior was the president of Wypetech, which was wholly owned by Diversey—not a third party. Even assuming, for the sake of argument, that Melchior and Diversey committed some wrongful act, that act did not result in the plaintiff being forced to expend resources defending itself in litigation with some third party.

The court will grant the defendants' alternative motions to strike, and under Fed. R. Civ. P. 12(f), will strike paragraphs 107-112 of the amended complaint.

## VI.   Conclusion

The court **GRANTS** defendant Melchior's motion to dismiss Counts I, III and IV and **DENIES** his motion to dismiss Count II. Dkt. No. 70.

The court **GRANTS** defendant Diversey Inc.'s motion to dismiss Counts I, III and IV and **DENIES** its motion to dismiss Count II.. Dkt. No. 73.

The court **GRANTS** defendant Melchior's Rule 12(f) motion to strike the plaintiff's allegations relating to, and claim for, attorneys' fees incurred in the

plaintiff's litigation against Wypetech in the Northern District of Illinois. Dkt. No. 70.

The court **GRANTS** defendant Diversey, Inc.'s Rule 12(f) motion to strike the plaintiff's allegations relating to, and claim for, attorneys' fees incurred in the plaintiff's litigation against Wypetech in the Northern District of Illinois. Dkt. No. 73.

The court **ORDERS** that paragraphs 107 through 112 of the amended complaint (Dkt. No. 52) are **STRICKEN** under Fed. R. Civ. P. 12(f).

Dated in Milwaukee, Wisconsin this 27th day of September, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

81